UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

XEROX CORPORATION,

                        **COMPLAINT**

             Plaintiff,

vs.

                    Civil Case No.: 18-6256

UNIVERSAL WILDE, INC.,

             Defendants.
_____

       Plaintiff, for its complaint in this action, alleges as follows:

## NATURE OF THE ACTION

       1.     This is an action for damages incurred by plaintiff Xerox Corporation ("Xerox") as a result of defendant Universal Wilde, Inc.'s ("Universal") material breaches and defaults under an equipment finance lease agreement, three maintenance agreements, and an account modification agreement. Xerox's damages exceed $1,127,979.48, plus costs and attorneys' fees, which are recoverable under the express terms of each of the agreements at issue and which are continuing to accrue.

## JURISDICTION AND VENUE

       2.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of citizenship amongst the parties, and the amount in controversy exceeds the sum or value of $75,000, exclusive of extra-contractual interest and costs.

       3.     Venue in the Western District of New York is proper pursuant to 29 U.S.C. § 1391. The parties contractually submitted to jurisdiction and venue in this Court.

## THE PARTIES

4.       Xerox is a corporation organized under the laws of the State of New York with its principal place of business located at 201 Merritt 7, Norwalk, Connecticut 06851-1056.

5.       Universal is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business located in Massachusetts.

## THE RELEVANT AGREEMENTS AND FACTUAL BACKGROUND

### The Equipment Finance Lease

6.       On or about August 28, 2014, Universal executed an equipment finance lease agreement (the "Finance Lease") pursuant to which Universal leased from Xerox (a) Xerox iGen 150 Printing Press (Serial No. XRD004598), (b) Xerox EFI 150 Print Server (Serial No. B3L698371), (c) Xerox iGen 150C Printing Press (Serial No. XRD004557), and (d) Xerox EFI 150 Print Server (Serial No. B3L698377) (referred to herein collectively as the "Leased Equipment").  A copy of the Finance Lease is attached hereto as Exhibit A and is incorporated herein.

7.       Pursuant to the Finance Lease, Universal agreed to make monthly minimum payments of $27,468.85, consisting of $12,945.20 for the iGen 150 Press, $2,950.00 for maintenance for the iGen 150 Press, $2,373.64 for the first EFI 150 Print Server, $9,776.37 for the iGen 150C Press, $2,850.00 for maintenance for the iGen 150C Press, and $2,373.64 for the second EFI 150 Print Server.

8.       Pursuant to the Finance lease and as further specified therein, Universal also agreed to make payments to Xerox of certain print charges to be calculated based on the number of prints produced by the Leased Equipment during each month of the term of the Finance Lease.

9.        The Finance Lease specifies a 60-month lease term.

10.     The Finance Lease contains the following provision:

> **NON-CANCELABLE AGREEMENT.** THIS AGREEMENT CANNOT BE CANCELED OR TERMINATED EXCEPT AS EXPRESSLY PROVIDED HEREIN. YOUR OBLIGATION TO MAKE ALL PAYMENTS, AND TO PAY ANY OTHER AMOUNTS DUE OR TO BECOME DUE, IS ABSOLUTE AND UNCONDITIONAL AND NOT SUBJECT TO DELAY, REDUCTION, SET OFF, DEFENSE, COUNTERCLAIM OR RECOUPMENT FOR ANY REASON WHATSOEVER, IRRESPECTIVE OF XEROX'S PERFORMANCE OF ITS OBLIGATIONS HEREUNDER. ANY CLAIM AGAINST XEROX MAY BE ASSERTED IN A SEPARATE ACTION AND SOLELY AGAINST XEROX.

11.     In the Finance Lease, Xerox disclaimed and Universal waived the implied warranties of non-infringement and fitness for a particular purpose.

12.     Xerox and Universal intended and agreed that the Finance Lease would be a "finance lease" as defined in Article 2A of the Uniform Commercial Code, and except as expressly provided in the Finance Lease, Universal waived all rights and remedies conferred upon a lessee in Article 2A of the Uniform Commercial Code.

13.     The Finance Lease provides that Universal's payment of invoices issued pursuant to the Finance Lease must be received by Xerox within 30 days after the invoice date.

14.     The Finance Lease provides that Xerox is entitled to a late charge equal to the greater of 5% of the amount due or $25 for any payment not received by Xerox within 10 days of the due date for payment.

15.     The Finance Lease states that Universal will be in default if Xerox does not receive payment within 15 days after it is due or if Universal breaches any other obligation under the Finance Lease or any other agreement with Xerox.

16.     The Finance Lease provides that upon default, Xerox may, in addition to other remedies, remove the Leased Equipment at Universal's expense, cease providing maintenance

services, and require immediate payment as liquidated damages, and not as a penalty, of (a) all amounts then due, plus interest from the due date until paid at the rate of 1.5% per month; (b) the remaining minimum/monthly payments throughout the remaining term of the Finance Lease, less any unearned finance, maintenance, and supply charges, as reflected in Xerox's books and records, and discounted at 4% per annum; (c) the applicable purchase option; and (d) all applicable taxes.

17.     The Finance Lease further states that upon default, Universal must also pay, in addition to the foregoing, all reasonable costs, including attorneys' fees, incurred by Xerox to enforce the Finance Lease.

18.     The Finance Lease states that it shall be governed by the laws of the State of New York, without regard to conflict-of-law principles.

19.     The Finance Lease states that in any action to enforce it, Universal and Xerox agree to the jurisdiction and venue of the federal and state courts in Monroe County, New York.

**The Maintenance Agreements**

20.     On or about August 27, 2014, Universal executed a Sale/Maintenance Agreement pursuant to which Universal agreed to make monthly payments of $947.00 to Xerox in exchange for certain maintenance services for an inline CP Bourge P224 Power Square (Serial No. BOT308525) and a Knife Trimmer (Serial No. B6U308816) (referred to herein as "Maintenance Agreement 1").  A copy of Maintenance Agreement 1 is attached hereto as Exhibit B and is incorporated herein.

21.     On or about October 1, 2014, Universal executed a Sale/Maintenance Agreement pursuant to which Universal agreed to make monthly payments of $1,200.00 to Xerox in exchange for certain supplemental maintenance services for iGen 150 Press (Serial No. XRD004598) and

EFI 150 Print Server (Serial No. B3L698371) (referred to herein as "Maintenance Agreement 2"). A copy of Maintenance Agreement 2 is attached hereto as Exhibit C and is incorporated herein.

22. Also on or about October 1, 2014, Universal executed a Sale/Maintenance Agreement pursuant to which Universal agreed to make monthly payments of $1,200.00 to Xerox in exchange for certain supplemental maintenance services for iGen 150C Printing Press (Serial No. XRD004557) and EFI 150 Print Server (Serial No. B3L698377) (referred to herein as "Maintenance Agreement 3"). A copy of Maintenance Agreement 3 is attached hereto as Exhibit D and is incorporated herein.

23. Maintenance Agreement 1, Maintenance Agreement 2, and Maintenance Agreement 3 (collectively referred to herein as the "Maintenance Agreements") each contain the following provision:

> NON-CANCELABLE AGREEMENT. THIS AGREEMENT CANNOT BE CANCELED OR TERMINATED EXCEPT AS EXPRESSLY PROVIDED HEREIN. YOUR OBLIGATION TO MAKE ALL PAYMENTS AND TO PAY ANY OTHER AMOUNTS DUE OR TO BECOME DUE SHALL BE ABSOLUTE AND UNCONDITIONAL AND SHALL NOT BE SUBJECT TO ANY DELAY, REDUCTION, SET-OFF, DEFENSE, COUNTERCLAIM OR RECOUPMENT FOR ANY REASON WHATSOEVER, IRRESPECTIVE OF XEROX'S PERFORMANCE OF ITS OBLIGATIONS HEREUNDER. ANY CLAIM AGAINST XEROX MAY BE ASSERTED IN A SEPARATE ACTION AND SOLELY AGAINST XEROX.

24. The Maintenance Agreements provide that Universal's payments of invoices must be paid so as to be received by Xerox on or before any due date listed on the invoice or, if no such due date is listed, no later than thirty days after the invoice date.

25. The Maintenance Agreements provide that Xerox is entitled to a late charge equal to the greater of 5% of the amount due or $25 for any payment not received by Xerox within 10 days of the due date for payment.

26.     The Maintenance Agreements state that Universal will be in default if Xerox does not receive payment within 15 days after it is due or if Universal breaches any other obligation under the Maintenance Agreements.

27.     The Maintenance Agreements provide that upon default, Xerox may, in addition to ceasing maintenance services, require immediate payment as liquidated damages, and not as a penalty, of (a) all amounts then due, plus interest from the due date until paid at the rate of 1.5% per month; and (b) the lesser of the remaining periodic base charges in the Maintenance Agreement's terms or either six such payments for one-year agreements or twelve such payments for multi-year agreements.

28.     The Maintenance Agreements further state that upon default, Universal must also pay, in addition to the foregoing, all costs Xerox incurs to enforce its rights under the agreements, including reasonable attorneys' fees and actual costs.

29.     Each of the Maintenance Agreements states that it shall be construed under the laws of the State of New York, without regard to conflict-of-law principles.

30.     Each of the Maintenance Agreements states that in any action to enforce it, Universal agrees to the jurisdiction and venue of the federal and state courts in Monroe County, New York.

**The Account Modification Agreement**

31.     The Leased Equipment was delivered to a location designated by Universal in or around August 2014, thereby commencing the term of the Finance Lease.

32.     Thereafter, Universal defaulted on its payment obligations under the Finance Lease and the Maintenance Agreements, and Universal requested that Xerox modify the Finance Lease, forbear from exercising its rights and remedies under the Finance Lease and Maintenance

Agreements, and modify the debt owed by Universal under the Finance Lease and Maintenance Agreements.

33.     Xerox and Universal executed and entered into an Account Modification Agreement, effective July 13, 2016 (the "Modification Agreement"), whereby Xerox agreed to modify Universal's debt under the Finance Lease and Maintenance Agreements and to forbear exercising its rights to collect that debt, subject to the terms and conditions set forth in the Modification Agreement. A copy of the Modification Agreement is attached hereto as Exhibit E and is incorporated herein.

34.     Pursuant to the Modification Agreement, Universal acknowledged that it had defaulted under the Finance Lease and Maintenance Agreements and further acknowledged the existence of its debt due and owing under the Finance Lease and Maintenance Agreements, "without defense, offset or counterclaim," in the amount specified in the Modification Agreement.

35.     Pursuant to the Modification Agreement, the parties agreed to modify certain specified terms of the Finance Lease and Maintenance Agreements, and they agreed that except for those portions of the Finance Lease and Maintenance Agreements expressly modified by the Modification Agreement, the Finance Lease and Maintenance Agreements remained the same and in full force and effect.

36.     The Finance Lease as modified by the Modification Agreement specifies a 60-month lease term commencing on August 1, 2016 and expiring on July 31, 2021.

37.     Pursuant to the Finance Lease as modified by the Modification Agreement, Universal agreed to make monthly minimum payments as follows: (a) $6,875.17 for Xerox iGen 150 Printing Press (Serial No. XRD004598), (b) $1,669.25 for Xerox EFI 150 Print Server (Serial

No. B3L698371), (c) $9,103.63 for Xerox iGen 150C Printing Press (Serial No. XRD004557), and (d) Xerox EFI 150 Print Server (Serial No. B3L698377).

38.     The Modification Agreement did not modify the print charges to be paid by Universal, and thus, those charges were to remain the same as specified in the Finance Lease throughout the modified term of that agreement.

39.     Pursuant to the Modification Agreement, the parties agreed that a default under the Finance Lease or any of the Maintenance Agreements, as modified, constitutes a default under the Modification Agreement.

40.     As part of the Modification Agreement, the parties agreed that notwithstanding any agreement to forbear exercising its rights, "upon the occurrence of an Event of Default, Xerox shall immediately be entitled to pursue its rights and remedies under [the Finance Lease and/or any of the Maintenance Agreements, as modified by the Modification Agreement] and applicable law without notice."

41.     The Modification Agreement defines an "Event of Default" as "any event or circumstance that is continuing and that, with the giving of notice, or passage of time, or both, would constitute a default, breach or an event of default under any of the" Finance Lease, any of the three Maintenance Agreements, or the Modification Agreement.

42.     The Modification Agreement provides that the Finance Lease and Maintenance Agreements as modified by the Modification Agreement constitute "the entire understanding and agreement" of Universal and Xerox with respect to the amount owed under the Finance Lease and Modification Agreements, that those documents "supersede all prior representations, warranties, agreements and understandings," and that no provision of those documents "may be changed,

discharged, supplemented, terminated or waived except in a writing signed" by Xerox and Universal.

43.     The Modification Agreement provides that any legal action or proceeding with respect to the Finance Lease, Maintenance Agreements, and/or Modification Agreement "shall be brought exclusively" in the courts of the State of New York located in Monroe County or in a United States District Court in New York and that the parties accept the jurisdiction of those courts.

44.     The Modification Agreement states: "The laws of the State of New York (without giving effect to its conflicts of laws principles) shall govern all matters arising out of, in connection with or relating to" the Modification Agreement, Finance Lease, and Maintenance Agreements.

### COUNT I
### BREACH OF THE FINANCE LEASE AS MODIFIED BY THE MODIFICATION AGREEMENT

45.     Xerox repeats and realleges the allegations set forth in paragraphs 1 through 44 above as if fully set forth and repeated herein.

46.     The Finance Lease as modified by the Modification Agreement is a valid and binding contract entered into upon the mutual agreement and assent of Xerox and Universal.

47.     The Leased Equipment was delivered and/or installed at a location designated by Universal.

48.     Xerox has not materially breached any of its obligations under the Finance Lease, as modified by the Modification Agreement.

49.     Universal received the benefits to which it was entitled under the Finance Lease, as modified, including but not limited to the use of the Leased Equipment and all corresponding equipment, supplies, and services.

50.     Xerox submitted to Universal invoices in accordance with the provisions of the Finance Lease, as modified.

51.     Universal failed to make its required payments of invoices issued under the Finance Lease, as modified, and materially breached and defaulted on its obligations under the terms of the Finance Lease and Modification Agreement.

52.     Universal failed to make its required payments under the Maintenance Agreements, and materially breached and defaulted on its obligations under the terms of the Maintenance Agreements.

53.     Universal's failure to make its required payments under the Finance Lease, the Modification Agreement, and the Maintenance Agreements constitutes a material breach and default under the Finance Lease and an Event of Default under the Modification Agreement.

54.     Despite Xerox's notifications, demands, and opportunities for Universal to cure the material breach and default under the Finance Lease, Modification Agreement, and Maintenance Agreements, Universal has not cured its material breach and default.

55.     Xerox is entitled to a judgment against Universal awarding Xerox damages arising from Universal's material breach and default in accordance with the provisions of the Finance Lease as modified by the Modification Agreement.

56.     To date, Xerox's damages recoverable under the Finance Lease as modified by the Modification Agreement exceed $1,103,659.72, plus Xerox's costs and attorneys' fees incurred in connection with this action, which are continuing to accrue.

## COUNT II
### BREACH OF MAINTENANCE AGREEMENT 1

57.     Xerox repeats and realleges the allegations set forth in paragraphs 1 through 56 above as if fully set forth and repeated herein.

58.     Maintenance Agreement 1 is a valid and binding contract entered into upon the mutual agreement and assent of Xerox and Universal.

59.     Xerox has not materially breached any of its obligations under Maintenance Agreement 1.

60.     Universal received the benefits to which it was entitled under Maintenance Agreement 1, including but not limited to corresponding maintenance services.

61.     Xerox submitted to Universal invoices in accordance with the provisions of Maintenance Agreement 1.

62.     Universal failed to make its required payments of invoices issued under the Maintenance Agreement 1 and materially breached and defaulted on its obligations under the terms of Maintenance Agreement 1.

63.     Despite Xerox's notifications, demands, and opportunities for Universal to cure the material breach and default under Maintenance Agreement 1, Universal has not cured its material breach and default.

64.     Xerox is entitled to a judgment against Universal awarding Xerox damages arising from Universal's material breach and default in accordance with the provisions of Maintenance 1.

65.     To date, Xerox's damages recoverable under Maintenance Agreement 1 exceed $6,319.76, plus Xerox's costs and attorneys' fees incurred in connection with this action, which are continuing to accrue.

## COUNT III
### BREACH OF MAINTENANCE AGREEMENT 2

66.     Xerox repeats and realleges the allegations set forth in paragraphs 1 through 65 above as if fully set forth and repeated herein.

67.     Maintenance Agreement 2 is a valid and binding contract entered into upon the mutual agreement and assent of Xerox and Universal.

68.     Xerox has not materially breached any of its obligations under Maintenance Agreement 2.

69.     Universal received the benefits to which it was entitled under Maintenance Agreement 2, including but not limited to corresponding maintenance services.

70.     Xerox submitted to Universal invoices in accordance with the provisions of Maintenance Agreement 2.

71.     Universal failed to make its required payments of invoices issued under the Maintenance Agreement 2 and materially breached and defaulted on its obligations under the terms of Maintenance Agreement 2.

72.     Despite Xerox's notifications, demands, and opportunities for Universal to cure the material breach and default under Maintenance Agreement 2, Universal has not cured its material breach and default.

73.     Xerox is entitled to a judgment against Universal awarding Xerox damages arising from Universal's material breach and default in accordance with the provisions of Maintenance 2.

74.     To date, Xerox's damages recoverable under Maintenance Agreement 2 exceed $8,400.00, plus Xerox's costs and attorneys' fees incurred in connection with this action, which are continuing to accrue.

## COUNT IV
## BREACH OF MAINTENANCE AGREEMENT 3

75.     Xerox repeats and realleges the allegations set forth in paragraphs 1 through 74 above as if fully set forth and repeated herein.

76.     Maintenance Agreement 3 is a valid and binding contract entered into upon the mutual agreement and assent of Xerox and Universal.

77.     Xerox has not materially breached any of its obligations under Maintenance Agreement 3.

78.     Universal received the benefits to which it was entitled under Maintenance Agreement 3, including but not limited to corresponding maintenance services.

79.     Xerox submitted to Universal invoices in accordance with the provisions of Maintenance Agreement 3.

80.     Universal failed to make its required payments of invoices issued under Maintenance Agreement 3, and materially breached and defaulted on its obligations under the terms of Maintenance Agreement 3.

81.     Despite Xerox's notifications, demands, and opportunities for Universal to cure the material breach and default under Maintenance Agreement 3, Universal has not cured its material breach and default.

82.     Xerox is entitled to a judgment against Universal awarding Xerox damages arising from Universal's material breach and default in accordance with the provisions of Maintenance Agreement 3.

83.     To date, Xerox's damages recoverable under Maintenance Agreement 3 exceed $9,600.00, plus Xerox's costs and attorneys' fees incurred in connection with this action, which are continuing to accrue.

WHEREFORE, Xerox is entitled to and hereby demands entry of judgment as follows:

(a)     On Count I, judgment against Universal awarding Xerox damages in accordance with the terms of the Finance Lease and Modification Agreement, which exceed $1,103,659.72, plus Xerox's costs and attorneys' fees incurred in connection with this action, which are continuing to accrue;

      (b)     On Count II, judgment against Universal awarding Xerox damages in accordance with the terms of Maintenance Agreement 1, which exceed $6,319.76, plus Xerox's costs and attorneys' fees incurred in connection with this action, which are continuing to accrue;

      (c)     On Count III, judgment against Universal awarding Xerox damages in accordance with the terms of Maintenance Agreement 2, which exceed $8,400.00, plus Xerox's costs and attorneys' fees incurred in connection with this action, which are continuing to accrue;

      (d)     On Count IV, judgment against Universal awarding Xerox damages in accordance with the terms of Maintenance Agreement 3, which exceed $9,600.00, plus Xerox's costs and attorneys' fees incurred in connection with this action, which are continuing to accrue; and

      (e)     Granting Xerox such other and further relief as the Court deems just and proper.

Dated:  March 28, 2018      WARD GREENBERG HELLER & REIDY LLP

                                                         s/Tony R. Sears
                            Tony R. Sears (tsears@wardgreenberg.com)
                            1800 Bausch & Lomb Place
                            Rochester, New York 14604
                            (585) 454-0700

                            *Attorneys for plaintiff Xerox Corporation*

# EXHIBIT A

## Lease Agreement



Customer: UNIVERSAL WILDE, INC

Bill To: UNIVERSAL WILDE INC
26 DARTMOUTH ST
WESTWOOD, MA 02090-2301

Install: UNIVERSAL WILDE INC
201 SUMMER ST
HOLLISTON, MA 01746-2260

Tax ID#: .

Negotiated Contract : 070716819

### Solution

| Item Product Description | Agreement Information | | Trade Information | Requested Install Date |
|---|---|---|---|---|
| 1. IGEN150 (IGEN 150 PRESS)<br>• Ala Install Kit<br>• 26 Stacker<br>• Igen4 26" Feed W/byp<br>• Igen4 Fin Enable Kit<br>• Matte Dry Ink Kit<br>• Third Party Equipment (TXC) | Lease Term:<br>Purchase Option: | 60 months<br>FMV | • Xerox DCIGEN3 S/N CC9151509<br>Trade-In as of Payment 58<br><br>• Xerox IGEN4 110 S/N<br>PWB001063<br>Trade-In | 8/31/2014 |
| 2. IG150EFI2 (IGEN150 EFI SERVER)<br>• Analyst Services | Lease Term:<br>Purchase Option: | 60 months<br>FMV | • Xerox IG3CREO S/N T2L400805<br>Trade-In as of Payment 58<br><br>• Xerox IG4CREO S/N NPB418404<br>Trade-In | 8/31/2014 |
| 3. IGEN150C (IGEN 150 PRESS)<br>• Ala Install Kit<br>• 26 Stacker<br>• Igen4 26" Feed W/byp<br>• Matte Dry Ink Kit | Lease Term:<br>Purchase Option: | 60 months<br>FMV | • Xerox DCIGEN3 S/N CC9151518<br>Trade-In as of Payment 59<br><br>• Xerox IGEN4 110 S/N<br>PWB005200<br>Purchase and Retain<br>as of Payment 38 | 8/31/2014 |
| 4. IG150EFI2 (IGEN150 EFI SERVER)<br>• Analyst Services | Lease Term:<br>Purchase Option: | 60 months<br>FMV | • Xerox IG3CREO S/N T2L400839<br>Trade-In as of Payment 59<br><br>• Xerox IG4CREO S/N AD7531267<br>Purchase and Retain | 8/31/2014 |

### Authorized Signature

Customer acknowledges receipt of the terms of this agreement which consists of 5 pages including this face page.

Signer: Patrick Kanicki          Phone: (508) 429-5515

Signature:          Date: X/2V/14

Thank You for your business!
This Agreement is proudly presented by Xerox and

Diane Sgourakos
(781) 672-7676

For information on your Xerox Account, go to
www.xerox.com/AccountManagement



**Lease Agreement**



## Monthly Pricing

| Item | Lease Minimum Payment | Maintenance Minimum Payment | Print Charges Meter | Volume Band | Per Print Rate | Maintenance Plan Features |
|---|---|---|---|---|---|---|
| 1. IGEN150 | $12,945.20 | $2,950.00 | 1: Meter 1<br>2: Meter 2<br>3: Meter 3<br>4: Meter 4 | All Prints<br>All Prints<br>All Prints<br>All Prints | $0.0450<br>$0.0052<br>$0.0176<br>$0.0062 | - Consumable Supplies Included for all prints |
| 2. IG150EFI2 | $2,373.64 | Included | N/A | N/A | N/A | - Full Service Maintenance Included |
| 3. IGEN150C | $9,776.37 | $2,850.00 | 1: Meter 1<br>2: Meter 2<br>3: Meter 3<br>4: Meter 4 | All Prints<br>All Prints<br>All Prints<br>All Prints | $0.0450<br>$0.0052<br>$0.0176<br>$0.0062 | - Consumable Supplies Included for all prints |
| 4. IG150EFI2 | $2,373.64 | Included | N/A | N/A | N/A | - Full Service Maintenance Included |
| Total | $27,468.85 | $5,800.00 | Minimum Payments (Excluding Applicable Taxes) | | | |

Confidential - Copyright © 2008 XEROX CORPORATION, All rights reserved.




Terms and Conditions

## INTRODUCTION:

**1. TOTAL SATISFACTION GUARANTEE.** "SP Equipment" means any iGen3, iGen4, iGen150, Xerox Color 8250 Production Printer or Xerox Continuous Feed Equipment. If, during any 90 day period, the performance of the SP Equipment delivered under this Agreement is not at least substantially consistent with the performance expectations outlined in the SP Equipment's Customer Expectations Document ("Expectations Document"), Xerox will, at your request, replace the SP Equipment without charge with identical Equipment or, at Xerox's option, with Xerox equipment with comparable features and capabilities. This Guarantee is not applicable during the first 180 days after installation and will expire 3 years after installation unless the SP Equipment is being financed under this Agreement for more than 3 years, in which event it will expire at the end of the initial Term of this Agreement. This Guarantee applies only to SP Equipment that has been (a) continuously maintained by Xerox under this Agreement or a Xerox maintenance agreement, and (b) operated at all times in accordance with the Expectations Document. This Guarantee replaces and supersedes any other guarantee from Xerox, whether made orally or in writing, styled a "Total Satisfaction Guarantee", "Satisfaction Guarantee" or otherwise covering the subject matter set forth above.

## SOLUTION/SERVICES:

**2. PRODUCTS.** "Products" means the equipment ("Equipment"), Software and supplies identified in this Agreement. You agree the Products are for your business use (not resale) in the United States and its territories and possessions ("U.S.") and will not be used for personal, household or family purposes.

**3. TRADE-IN EQUIPMENT.** You warrant that you have the right to transfer title to the equipment you are trading in as part of this Agreement ("Trade-In Equipment") and that the Trade-In Equipment is in good working order and has not been modified from its original configuration (other than by Xerox). Title and risk of loss to the Trade-In Equipment will pass to Xerox when Xerox removes it from your premises. You will maintain the Trade-In Equipment at its present site and in substantially its present condition until removed by Xerox. You will pay all accrued charges for the Trade-In Equipment (up to and including payment of the final principal payment number) and all applicable maintenance, administrative, supply and finance charges until Xerox removes the Trade-In Equipment from your premises.

**4. CONSUMABLE SUPPLIES.** If "Consumable Supplies" is identified in Maintenance Plan features, Maintenance Services will include black toner and/or solid ink and color toner and/or solid ink, if applicable ("Consumable Supplies"). Highlight color toner, clear toner, and custom color toner are excluded. Depending on the Equipment model, Consumable Supplies may also include developer, fuser agent, imaging units, waste cartridges, transfer rolls, transfer belts, transfer units, belt cleaner, maintenance kits, print Cartridges, drum Cartridges, waste trays and cleaning kits. Xerox may charge a shipping and handling fee for Consumable Supplies. Consumable Supplies are Xerox's property until used by you, and you will use them only with the Equipment for which "Consumable Supplies" is identified in Maintenance Plan Features. If Consumables Supplies are furnished with recycling information, Customer will return the used item to Xerox for remanufacturing. Shipping information is available at Xerox.com/GWA. Upon expiration of this Agreement, Customer will include any unused Consumable Supplies with the Equipment for return to Xerox at the time of removal. If your use of Consumable Supplies exceeds Xerox's published yield by more than 10%, Xerox will notify you of such excess usage. If such excess usage does not cease within 30 days after such notice, Xerox may charge you for such excess usage. Upon request, you will provide current meter reads and/or an inventory of Consumable Supplies in your possession.

**5. CARTRIDGES.** If Xerox is providing Maintenance Services for Equipment utilizing cartridges designated by Xerox as customer replaceable units, including copy/print cartridges and xerographic modules or fuser modules ("Cartridges"), you agree to use only unmodified Cartridges purchased directly from Xerox or its authorized resellers in the U.S. Cartridges packed with Equipment and replacement Cartridges may be new, remanufactured or reprocessed. Remanufactured and reprocessed Cartridges meet Xerox's new Cartridge performance standards and contain new or reprocessed components. To enhance print quality, Cartridge(s) for many models of Equipment have been designed to cease functioning at a predetermined point. In addition, many Equipment models are designed to function only with Cartridges that are newly manufactured original Xerox Cartridges or with Cartridges intended for use in the U.S.

**6. MAINTENANCE SERVICES.** Except for Equipment identified as "No Svc.", Xerox (or a designated servicer) will keep the Equipment in good working order ("Maintenance Services"). The provision of Maintenance Services is contingent upon Customer

facilitating timely and efficient resolution of Equipment issues by: (a) utilizing Customer-implemented remedies provided by Xerox; (b) replacing Cartridges; and (c) providing information to and implementing recommendations provided by Xerox telephone support personnel. If an Equipment issue is not resolved after completion of (a) through (c) above, Xerox will provide on-site support as provided herein. Maintenance Services will be provided during Xerox's standard working hours in areas open for repair service for the Equipment. Maintenance Services excludes repairs due to: (i) misuse, neglect or abuse; (ii) failure of the installation site or the PC or workstation used with the Equipment to comply with Xerox's published specifications, (iii) use of options, accessories or products not serviced by Xerox; (iv) non-Xerox alterations, relocation, service or supplies; or (v) failure to perform operator maintenance procedures identified in operator manuals. Replacement parts may be new, reprocessed or recovered and all replaced parts become Xerox's property. Xerox will, as your exclusive remedy for Xerox's failure to provide Maintenance Services, replace the Equipment with an identical model or, at Xerox's option, another model with comparable features and capabilities. There will be no additional charge for the replacement Equipment during the remainder of the initial Term. If meter reads are a component of your Maintenance Plan, you will provide them using the method and frequency identified by Xerox. If you do not provide a meter reading for Equipment not capable of Remote Data Access, or if Remote Data Access is interrupted, Xerox may estimate the reading and bill you accordingly.

**7. EQUIPMENT STATUS.** Unless you are acquiring "Previously Installed" Equipment, Equipment will be (1) "Newly Manufactured", which may contain some reconditioned components; (2) "Factory Produced New Model", which is manufactured and newly serialized at a Xerox factory, adds functions and features to a product previously disassembled to a Xerox predetermined standard, and contains new and reconditioned components; or (3) "Remanufactured", which has been factory produced following disassembly to a Xerox predetermined standard and contains new and reconditioned components.

**8. SOFTWARE LICENSE.** Xerox grants you a non-exclusive, non-transferable license to use in the U.S: (a) software and accompanying documentation provided with Xerox-brand Equipment ("Base Software") only with the Xerox-brand Equipment with which it was delivered; and (b) software and accompanying documentation identified in this Agreement as "Application Software" only on any single unit of equipment for as long as you are current in the payment of all applicable software license fees. "Base Software" and "Application Software" are referred to collectively as "Software". You have no other rights and may not: (1) distribute, copy, modify, create derivatives of, decompile, or reverse engineer Software; (2) activate Software delivered with the Equipment in an inactivated state; or (3) allow others to engage in same. Title to, and all intellectual property rights in, Software will reside solely with Xerox and/or its licensors (who will be considered third-party beneficiaries of this Section). Software may contain code capable of automatically disabling the Equipment. Disabling code may be activated if: (x) Xerox is denied access to periodically reset such code; (y) you are notified of a default under this Agreement; or (z) your license is terminated or expires. The Base Software license will terminate: (i) if you no longer use or possess the Equipment; (ii) you are a lessor of the Equipment and your first lessee no longer uses or possesses it; or (iii) upon the expiration or termination of this Agreement, unless you have exercised your option to purchase the equipment. Neither Xerox nor its licensors warrant that Software will be free from errors or that its operation will be uninterrupted. The foregoing terms do not apply to Diagnostic Software or to software/documentation accompanied by a clickwrap or shrinkwrap license agreement or otherwise made subject to a separate license agreement.

**9. SOFTWARE SUPPORT.** Xerox (or a designated servicer) will provide the software support set forth below ("Software Support"). For Base Software, Software Support will be provided during the initial Term and any renewal period but in no event longer than 5 years after Xerox stops taking customer orders for the subject model of Equipment. For Application Software, Software Support will be provided as long as you are current in the payment of all applicable software license and support fees. Xerox will maintain a web-based or toll-free hotline during Xerox's standard working hours to report Software problems and answer Software-related questions. Xerox, either directly or with its vendors, will make reasonable efforts to: (a) assure that Software performs in material conformity with its user documentation; (b) provide available workarounds or patches to resolve Software performance problems; and (c) resolve coding errors for (i) the current Release and (ii) the previous Release for a period of 6 months after the current Release is made available to you. Xerox will not be required to provide Software Support if you have modified the Software. New releases of Software that primarily

Confidential - Copyright © 2008 XEROX CORPORATION. All rights reserved.
Page 2 of 5




Terms and Conditions

incorporate compliance updates and coding error fixes are designated as "Maintenance Releases" or "Updates". Maintenance Releases or Updates that Xerox may make available will be provided at no charge and must be implemented within six months. New releases of Software that include new content or functionality ("Feature Releases") will be subject to additional license fees at Xerox's then-current pricing. Maintenance Releases, Updates and Feature Releases are collectively referred to as "Releases". Each Release will be considered Software governed by the Software License and Software Support provisions of this Agreement (unless otherwise noted). Implementation of a Release may require you to procure, at your expense, additional hardware and/or software from Xerox or another entity. Upon installation of a Release, you will return or destroy all prior Releases.

**10. DIAGNOSTIC SOFTWARE.** Software used to evaluate or maintain the Equipment ("Diagnostic Software") is included with the Equipment. Diagnostic Software is a valuable trade secret of Xerox. Title to Diagnostic Software will remain with Xerox or its licensors. Xerox does not grant you any right to use Diagnostic Software, and you will not access, use, reproduce, distribute or disclose Diagnostic Software for any purpose (or allow third parties to do so). You will allow Xerox reasonable access to the Equipment to remove or disable Diagnostic Software if you are no longer receiving Maintenance Services from Xerox, provided that any on-site access to your facility will be during your normal business hours

**PRICING PLAN/OFFERING SELECTED:**

**11. COMMENCEMENT & TERM.** This Agreement is valid when accepted by Xerox. The Term for each unit of Equipment will commence upon: (i) the delivery of customer-installable Equipment; or (ii) the installation of Xerox-installable Equipment ("Commencement Date") and will continue for the number of full calendar months shown as "Lease Term" on the face of this Agreement. Any partial month in the Term will be billed on a pro rata basis, based on a 30 day month. Unless either party provides notice of termination at least thirty days before the expiration of the initial Term, it will renew automatically on a month-to-month basis on the same terms and conditions. During this renewal period, either party may terminate the Equipment upon at least 30 days notice. On termination, you will make the Products available for removal by Xerox. At the time of removal, the Equipment will be in the same condition as when delivered (reasonable wear and tear excepted).

**12. SEPARATELY BILLED MAINTENANCE.** If a Minimum Payment is included in Maintenance Plan Features for an item of Equipment, the Minimum Payment for Maintenance Services will be billed separately.

**13. PAYMENT.** Payment must be received by Xerox within 30 days after the invoice date. All invoice payments under this section shall be made via check, Automated Clearing House debit, Electronic Funds Transfer, or direct debit from Customer s bank account. Restrictive covenants on payment instruments will not reduce your obligations.

**14. OTHER CHARGES.** You will pay a one-time documentation fee of $100 for this Agreement. If a payment is not received by Xerox within 10 days after the due date, Xerox may charge, and you will pay, a late charge of 5% of the amount due or $25, whichever is greater

**15. PRICE INCREASES.** Xerox may annually increase the maintenance component of the Minimum Payment and Print Charges. For Application Software, Xerox may annually increase the software license or support fees.

**16. DELIVERY, REMOVAL & RELOCATION.** Equipment prices include standard delivery charges and, for Xerox-owned Equipment, standard removal charges. Charges for non-standard delivery or removal and for any Equipment relocation are your responsibility. Relocation of Xerox-owned Equipment must be arranged (or approved in advance) by Xerox and may not be to a location outside of the U.S.

**17. TAXES.** You will be responsible for all applicable taxes, fees or charges of any kind (including interest and penalties) assessed by any governmental entity on this Agreement or the amounts payable under this Agreement ("Taxes"), which will be included in Xerox's invoice unless you timely provide proof of your tax exempt status. Taxes do not include personal property taxes in jurisdictions where Xerox is required to pay personal property taxes, and taxes on Xerox's income. This Agreement is a lease for all income tax purposes and you will not claim any credit or deduction for depreciation of the Equipment, or take any other action inconsistent with your role as lessee of the Equipment.

**18. PURCHASE OPTION.** If not in default, you may purchase the Equipment, "AS IS, WHERE IS" and WITHOUT ANY WARRANTY AS TO CONDITION OR VALUE, at the end of the initial Term for the "Purchase Option" indicated on the face of this Agreement

(i.e., either a set dollar amount or the fair market value of the Equipment at the expiration of the initial Term), plus all applicable Taxes.

**19. DEFAULT & REMEDIES.** You will be in default under this Agreement if (1) Xerox does not receive any payment within 15 days after the date it is due, or (2) you breach any other obligation in this or any other agreement with Xerox. If you default, Xerox may, in addition to its other remedies (including cessation of Maintenance Services), remove the Equipment at your expense and require immediate payment, as liquidated damages for loss of bargain and not as a penalty, of: (a) all amounts then due, plus interest from the due date until paid at the rate of 1.5% per month; (b) the Minimum Payments (less the Maintenance Services and Consumable Supplies components thereof, as reflected on Xerox's books and records) remaining in the Term, discounted at 4% per annum; (c) the applicable Purchase Option; and (d) all applicable Taxes. You will pay all reasonable costs, including attorneys' fees, incurred by Xerox to enforce this Agreement. If you make the Equipment available for removal by Xerox within 30 days after notice of default, in the same condition as when delivered (reasonable wear and tear excepted), you will receive a credit for the fair market value of the Equipment as determined by Xerox, less any costs incurred by Xerox.

**20. NON-XEROX PRODUCTS.** Third Party Equipment (TXC) were selected by you and are not sold by Xerox in the normal course of its business ("Non-Xerox Products"). If you signed a purchase contract for Non-Xerox Products, you assign to Xerox your rights but none of your obligations under such purchase contract. Xerox is leasing Non-Xerox Products to you "AS IS, WHERE IS" and XEROX MAKES NO EXPRESS OR IMPLIED WARRANTIES OF ANY KIND REGARDING NON-XEROX PRODUCTS, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE AND NON-INFRINGEMENT. To the extent permitted to do so, Xerox assigns to you any warranty rights it has to Non-Xerox Products (which rights shall revert to Xerox if you default under this Agreement). Non-Xerox Products are not covered by Maintenance Services, and you will maintain throughout the initial Term a service agreement for Non-Xerox Products with a service provider acceptable to Xerox You will pay all personal property taxes related to Non-Xerox Products. You assign to Xerox any rights you have to Non-Xerox Products and title will pass or revert to you (subject to any software licenses relating to Non-Xerox Products) upon expiration of the initial Term.

**21. REFINANCE.** The "Amount Refinanced" is included in the amount financed under this Agreement. If the Amount Refinanced is under an agreement with a third party, you acknowledge you have the right to terminate the agreement and you will provide Xerox with a statement from the third party identifying the equipment at issue, the amount to be paid off and the payee's name and mailing address. If the Amount Refinanced is under an agreement with Xerox, the refinancing will render your prior agreement null and void. If you breach any of your obligations under this Agreement, the full Amount Refinanced will be immediately due and payable.

**22. DATA SECURITY.** Certain models of Equipment can be configured to include a variety of data security features. There may be an additional cost associated with certain data security features. The selection, suitability and use of data security features are solely Customer's responsibility. Upon request, Xerox will provide additional information to Customer regarding the security features available for particular Equipment models.

**GENERAL TERMS & CONDITIONS:**

**23. NON-CANCELABLE AGREEMENT.** THIS AGREEMENT CANNOT BE CANCELED OR TERMINATED EXCEPT AS EXPRESSLY PROVIDED HEREIN. YOUR OBLIGATION TO MAKE ALL PAYMENTS, AND TO PAY ANY OTHER AMOUNTS DUE OR TO BECOME DUE, IS ABSOLUTE AND UNCONDITIONAL AND NOT SUBJECT TO DELAY, REDUCTION, SET-OFF, DEFENSE, COUNTERCLAIM OR RECOUPMENT FOR ANY REASON WHATSOEVER, IRRESPECTIVE OF XEROX'S PERFORMANCE OF ITS OBLIGATIONS HEREUNDER. ANY CLAIM AGAINST XEROX MAY BE ASSERTED IN A SEPARATE ACTION AND SOLELY AGAINST XEROX.

**24. REPRESENTATIONS.** The individuals signing this Agreement are duly authorized to do so and all financial information you provide completely and accurately represents your financial condition.

**25. LIMITATION OF LIABILITY.** Except for liability under the indemnification obligations set forth in this Agreement, Xerox will not be liable to you for any direct damages in excess of $10,000 or the amounts paid hereunder, whichever is greater, and neither party will be liable to the other for any special, indirect, incidental, consequential or punitive damages arising out of or relating to this Agreement, whether the claim alleges tortious conduct (including negligence) or any other legal theory. Any



Terms and Conditions

action you take against Xerox must be commenced within 2 years after the event that caused it.

**26. CREDIT REPORTS.** You authorize Xerox or its agent to obtain credit reports from commercial credit reporting agencies

**27. FORCE MAJEURE.** Xerox will not be liable to you during any period in which its performance is delayed or prevented, in whole or in part, by a circumstance beyond its reasonable control. Xerox will notify you if such a circumstance occurs.

**28. PROTECTION OF XEROX'S RIGHTS.** You authorize Xerox or its agent to file, by any permissible means, financing statements necessary to protect Xerox's rights as lessor of the Equipment. You will promptly notify Xerox of a change in ownership, or if you relocate your principal place of business or change the name of your business

**29. WARRANTY DISCLAIMER.** XEROX DISCLAIMS THE IMPLIED WARRANTIES OF NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE. This Agreement is a "finance lease" under Article 2A of the Uniform Commercial Code and, except to the extent expressly provided herein, and as permitted by applicable law, you waive all of your rights and remedies as a lessee under Article 2A.

**30. INTELLECTUAL PROPERTY INDEMNITY.** Xerox will defend, and pay any settlement agreed to by Xerox or any final judgment for, any claim that a Xerox-brand Product infringes a third party's U.S. intellectual property rights. You will promptly notify Xerox of any alleged infringement and permit Xerox to direct the defense. Xerox is not responsible for any non Xerox litigation expenses or settlements unless it pre-approves them in writing. To avoid infringement, Xerox may modify or substitute an equivalent Xerox-brand Product, refund the price paid for the Xerox-brand Product (less the reasonable rental value for the period it was available to you), or obtain any necessary licenses. Xerox is not liable for any infringement based upon a Xerox-brand Product being modified to your specifications or being used or sold with products not provided by Xerox.

**31. TITLE & RISK OF LOSS.** Until you exercise your Purchase Option: (a) title to Equipment will remain with Xerox; (b) Equipment will remain personal property; (c) you will not attach the Equipment as a fixture to any real estate; (d) you will not pledge, sublease or part with possession of it, or file or permit to be filed any lien against it; and, (e) you will not make any permanent alterations to it. Risk of loss passes to you upon delivery and remains with you until Xerox removes the Equipment. You will keep the Products insured against loss or damage and the policy will name Xerox as a loss payee.

**32. ASSIGNMENT.** Except for assignment by Xerox to a parent, subsidiary or affiliate of Xerox, or to securitize this Agreement as part of a financing transaction ("Permitted Assignment"), neither party will assign any of its rights or obligations under this Agreement without the prior written consent of the other party. In the event of a Permitted Assignment: (a) Xerox may, without your prior written consent, release to the proposed assignee information it has about you related to this Agreement; (b) the assignee will have all of the rights but none of the obligations of Xerox hereunder; (c) you will continue to look to Xerox for performance of Xerox's obligations, including the provision of Maintenance Services; (d) you waive and release the assignee from any claim relating to or arising from the performance of Xerox's obligations hereunder; (e) you shall not assert any defense, counterclaim or setoff you may have against an assignee; and (f) you will remit payments in accordance with instructions of the assignee.

**33. MISCELLANEOUS.** Notices must be in writing and will be deemed given 5 days after mailing, or 2 days after sending by nationally recognized overnight courier. Notices will be sent to you at the "Bill to" address identified in this Agreement, and to Xerox at

the inquiry address set forth on your most recent invoice, or to such other address as either party may designate by written notice. You authorize Xerox or its agents to communicate with you by any electronic means (including cellular phone, email, automatic dialing and recorded messages) using any phone number (including cellular) or electronic address you provide to Xerox. This Agreement constitutes the entire agreement as to its subject matter, supersedes all prior oral and written agreements, and will be governed by the laws of the State of New York (without regard to conflict-of-law principles). In any action to enforce this Agreement, the parties agree (a) to the jurisdiction and venue of the federal and state courts in Monroe County, New York, and (b) to waive their right to a jury trial. If a court finds any term of this Agreement unenforceable, the remaining terms will remain in effect. The failure by either party to exercise any right or remedy will not constitute a waiver of such right or remedy. Each party may retain a reproduction (e.g., electronic image, photocopy, facsimile) of this Agreement which will be admissible in any action to enforce it, but only the Agreement held by Xerox will be considered an original. Xerox may accept this Agreement either by signature or by commencing performance. Changes to this Agreement must be in writing and signed by both parties. Any terms on your ordering documents will be of no force or effect. The following four sentences control over every other part of this Agreement. Both parties will comply with applicable laws. Xerox will not charge or collect any amounts in excess of those allowed by applicable law. Any part of this Agreement that would, but for the last four sentences of this Section, be read under any circumstances to allow for a charge higher than that allowed under any applicable legal limit, is modified by this Section to limit the amounts chargeable under this Agreement to the maximum amount allowed under the legal limit. If, in any circumstances, any amount in excess of that allowed by law is charged or received, any such charge will be deemed limited by the amount legally allowed and any amount received by Xerox in excess of that legally allowed will be applied by Xerox to the payment of amounts legally owed under this Agreement, or refunded to you.

**34. REMOTE SERVICES.** Certain models of Equipment are supported and serviced using data that is automatically collected by Xerox or transmitted to or from Xerox by the Equipment connected to Customer's network ("Remote Data") via electronic transmission to a secure off-site location ("Remote Data Access"). Remote Data Access also enables Xerox to transmit to Customer Releases for Software and to remotely diagnose and modify Equipment to repair and correct malfunctions. Examples of Remote Data include product registration, meter read, supply level, Equipment configuration and settings, software version, and problem/fault code data. Remote Data may be used by Xerox for billing, report generation, supplies replenishment, support services, recommending additional products and services, and product improvement/development purposes. Remote Data will be transmitted to and from Customer in a secure manner specified by Xerox. Remote Data Access will not allow Xerox to read, view or download the content of any Customer documents or other information residing on or passing through the Equipment or Customer's information management systems. Customer grants the right to Xerox, without charge, to conduct Remote Data Access for the purposes described above. Upon Xerox s request, Customer will provide contact information for Equipment such as name and address of Customer contact and IP and physical addresses/locations of Equipment. Customer will enable Remote Data Access via a method prescribed by Xerox, and Customer will provide reasonable assistance to allow Xerox to provide Remote Data Access. Unless Xerox deems Equipment incapable of Remote Data Access, Customer will ensure that Remote Data Access is maintained at all times Maintenance Services are being performed.

# EXHIBIT B

*Bonry Smri cs*

# SALE / MAINTENANCE AGREEMENT — Only

**XEROX**

**Full Legal Name**

| | |
|---|---|
| Customer Name (Bill to) | Universal Wilde |
| DBA/Name Overflow | |
| Street Address | 26 Dartmouth Street |
| Box/Routing | |
| City, State | Westwood, MA |
| Zip Code | 02090-2301 |
| Tax ID# | |

| | |
|---|---|
| Customer Name (Install) | Universal Wilde |
| DBA/Name Overflow (if req'd) | |
| Installed at Street Address | 201 Summer Street |
| Floor/Room/Routing | |
| City, State | Holliston, MA |
| Zip Code | 01746-2258 |
| County Installed in | Middlesex |
| Customer Requested Install Date | 04/01/2014 |

**Check all that apply**
- ☐ Assoc./Corp. Name:
- ☒ Negotiated Contract #: 0707168     ☐ DSA Contract #:
- ☐ Attached Customer P.O. #s:   Supplies:
  Sale/Install:_____  Maint.:_____
- ☐ State or Local Government Customer
- ☐ Replacement/Modification of Prior Xerox Agreement
  Agreement covering Xerox Equipment Serial# (or 950):
  is hereby ☐ modified ☐ replaced   Effective Date:
  Comments:
- ☐ Installment Sale Information  Install. Sale Term:_____ months
  Int. Rate:_% Total Int. Payable: $
  ☐ Prepaid Invoice:_____ months
  ☐ Refin. of Prior Agmt.: ☐ Xerox (950):   ☐ 3rd Party Eq.
  Amt Refin: $   Int Rate:_%   Total Int Payable: $
- ☒ Maintenance Information   Maintenance Term:_____ months
- ☐ Supplies Included in Base/Print Charges

**Cash Sale/Installment Sale - Payment Information**

| Product (with serial number, if in place equipment) | Qty | Prev Install | Pin'l Interm | Wait # mo | List Price (Total) | Down Payment | Total Discount (Inc. Trade-In) | Net Price (Total) |
|---|---|---|---|---|---|---|---|---|
| Inline CP Bourge P224 Power Square | 1 | ☐ | ☐ | | $ | $ | $ | $ |
| 2 Knife Trimmer | 1 | ☐ | ☐ | | $ | $ | $ | $ |
| | | ☐ | ☐ | | $ | $ | $ | $ |
| | | ☐ | ☐ | | $ | $ | $ | $ |
| | | ☐ | ☐ | | $ | $ | $ | $ |

$_____ . INSTALLMENT SALE PAYMENT (excl. of applic. taxes)

**Payment Frequency** ☐ Monthly ☐ Other:_____
**Payment Mode** ☐ Advance ☐ Arrears

## Maintenance Agreement Price Information   ☐ Adjustment Period (Maintenance Agreement Only)

| Period A - Mos. Affected: | | Period B - Mos. Affected: |
|---|---|---|
| **Periodic Base Charge** $ | **Periodic Base Charge** $ | **Periodic Base Charge** $ |
| **Print Charge Meter 1:** $ | **Print Charge Meter 1:** $ | **Print Charge Meter 1:** $ |
| Prints   1  $ | Prints   1  $ | Prints   1  $ |
| Prints   .  $ | Prints   .  $ | Prints   .  $ |
| Prints   .  $ | Prints   .  $ | Prints   .  $ |
| **Print Charge Meter 2:** $ | **Print Charge Meter 2:** $ | **Print Charge Meter 2:** $ |
| Prints   1  $ | Prints   1  $ | Prints   1  $ |
| Prints   .  $ | Prints   .  $ | Prints   .  $ |
| Periodic Min.# of Prints (based on Meter 1 Print Charges) | Periodic Min.# of Prints (based on Meter 1 Print Charges) | Periodic Min.# of Prints (based on Meter 1 Print Charges) |

| ☐ Purchased Supplies | ☐ Cash ☐ Fin'd | | | ☐ Application Software | | |
|---|---|---|---|---|---|---|
| Reorder # | Qty | Description | Price | Software Title | Initial License Fee | Annual Renewal Fee |
| | | | $ | | ☐ Cash ☐ Finance | ☐ Support Only |
| | | | $ | | $ | $ |
| | | | $ | | $ | $ |
| | | Total Price = | $ | Total Initial License Fees = | $ | |

| ☐ Trade-In Allowance | | | | ☐ K-16 Billing | Additional Options (check all that apply) |
|---|---|---|---|---|---|
| Manufacturer | Model/ Serial # | Final Principal Payment #: | Allowance | Suspension (check 1 as required) Months affected: | ☐ Run Length Plan ☐ Fixed Price Plan  ☐ Per-Foot Pricing ☐ Quarterly-Bill Plan  ☐ Extended Service Hours: |
| | | | $ | ☐ June only | Description:_____ |
| | | | $ | ☐ July only | ☒ Std. Maint. Agmt. $941.00/month |
| | Total Allowance = | | $ | ☐ August only | ☐ Attached Addendum |
| Total Allowance Applied to: ☐ Trade-In Equip. Balance: | | | $ | ☐ June - July | |
| ☐ Price of Replacement Equip.: | | | $ | ☐ July - August | ☐ Other Addenda: |

**Agreement Presented By:**
Xerox Name: Dlene Czen   Phone:

FOR AUTHORIZED HQ INTERNAL USE ONLY

| | |
|---|---|
| Accepted | Xerox Corporation |
| By | |
| _____(Signature of Authorized Rep.) | |
| Title | Date |
| V.P. & Gen'l | Unit |

www.xerox.com

**CUSTOMER ACKNOWLEDGES RECEIPT OF THE TERMS OF THIS AGREEMENT (CONSISTING OF 6 PAGES INCLUDING THIS FACE PAGE)**

Auth Signer Name: Patrick Roulich
_____(Please Print Name of Authorized Signer)
Signature: X_____   Date: 8/7/14
_____(Signature of Authorized Signer)
Auth Signer Title:_____   Phone: 508-429-5545
E-Mail:
☒ Tax Exempt (*Must attach Sales Tax Exemption Certificate)

GENERAL TERMS: The following terms apply to all sale and maintenance transactions:

1. PRODUCTS. The term "Products" shall refer collectively to all equipment (the "Equipment"), software, and supplies ordered under this Agreement. You represent that the Products are being ordered for your own business use (rather than resale) and that they will not be used for personal, household or family purposes.

2. NON-CANCELABLE AGREEMENT. THIS AGREEMENT CANNOT BE CANCELED OR TERMINATED EXCEPT AS EXPRESSLY PROVIDED HEREIN. YOUR OBLIGATION TO MAKE ALL PAYMENTS AND TO PAY ANY OTHER AMOUNTS DUE OR TO BECOME DUE SHALL BE ABSOLUTE AND UNCONDITIONAL AND SHALL NOT BE SUBJECT TO ANY DELAY, REDUCTION, SET-OFF, DEFENSE, COUNTERCLAIM OR RECOUPMENT FOR ANY REASON WHATSOEVER, IRRESPECTIVE OF XEROX'S PERFORMANCE OF ITS OBLIGATIONS HEREUNDER. ANY CLAIM AGAINST XEROX MAY BE ASSERTED IN A SEPARATE ACTION AND SOLELY AGAINST XEROX.

3. PAYMENT, TAXES & CREDIT HISTORY.

A. Invoices are payable upon receipt and you agree to pay Xerox each Net Price amount or Installment Sale Payment (as applicable), each Minimum Periodic Base Charge, all Print Charges and all other sums due as follows: (i) if the invoice displays a due date, payment is due and must be received by Xerox on or before said due date, or (ii) if the invoice does not display a due date, payment is due and must be received by Xerox no later than thirty (30) days after the invoice date. . Restrictive covenants on instruments or documents submitted for or with payments you send to Xerox will not reduce your obligations.

B. You shall be responsible for any and all applicable Taxes, which will be included in Xerox's invoice unless you provide proof of your tax exempt status. "Taxes" shall mean any tax, assessment or charge imposed or collected by any governmental entity or any political subdivision thereof, however designated or levied, imposed on this Agreement or the amounts payable to Xerox by you for the billing of Products, Print Charges, services and maintenance of any kind; Taxes include, but are not limited to, sales and use, rental, excise, gross receipts and occupational or privilege taxes, plus any interest and/or penalty thereon, but excluding any taxes on Xerox's net income. If a taxing authority determines that Xerox did not collect all applicable Taxes, you shall remain liable to Xerox for such additional Taxes.

C. You, to the extent required by applicable law, authorize Xerox (or its agent) to obtain credit reports, make such other credit inquiries as Xerox may deem necessary at any time, furnish payment history information to credit reporting agencies, and release to prospective assignees of this Agreement or any rights hereunder credit-related information Xerox has about you and this Agreement. Even if Products have been delivered, Xerox may, within sixty (60) days following its acceptance of this Agreement, revoke the Agreement if your credit approval is denied.

4. BASIC SERVICES. Xerox (or a designated servicer) will provide the following Basic Services under an express warranty or maintenance agreement (unless you are acquiring Equipment for which Xerox does not offer Basic Services; such Equipment to be designated as "No Svc."):

A. REPAIRS & PARTS. Xerox will make repairs and adjustments necessary to keep Equipment in good working order (including such repairs or adjustments required during initial installation). Parts required for repair may be new, reprocessed, or recovered.

B. HOURS & EXCLUSIONS. Unless otherwise stated, Basic Services will be provided during Xerox's standard working hours (excluding Xerox-recognized holidays) in areas within the United States, its territories, and possessions open for repair service for the Equipment at issue. You agree to give Xerox reasonable access to the Equipment. Basic Services shall cover repairs and adjustments required as a result of normal wear and tear or defects in materials or workmanship (and shall exclude repairs or adjustments Xerox determines to relate to or be affected by the use of options, accessories, or other connected products not serviced by Xerox, as well as any non-Xerox alterations, relocation, service, supplies, or consumables). You agree to use Equipment in accordance with, and to perform all operator maintenance procedures for Equipment as set forth in, the applicable manuals provided by Xerox.

C. INSTALLATION SITE & METER READINGS. The Equipment installation site must conform to Xerox's published requirements throughout the term of this Agreement. If applicable, you agree to provide meter readings in the manner prescribed by Xerox. If you do not provide Xerox with meter readings as required, Xerox may estimate them and bill you accordingly.

D. UNABLE TO MAINTAIN EQUIPMENT. If Xerox is unable to maintain the Equipment as described above, Xerox will, as your exclusive remedy for Xerox's failure to provide Basic Services, replace the Equipment with an identical product or, at Xerox's option, another product of equal or greater capabilities. If a replacement product is provided pursuant to this Section, there will not be an additional charge for the replacement product and, except as set forth in the Section of this Agreement titled "PRICING INCREASES FOR MULTI-YEAR AGREEMENTS" , there will not be an additional charge for Basic Services during the then-current term during which Basic Services are being provided.

E. CARTRIDGE PRODUCTS. If Xerox is providing Basic Services for Equipment utilizing cartridges designated by Xerox as customer replaceable units, including copy/print cartridges and xerographic modules or fuser modules ("Cartridges"), and unless you have entered into a Standard Maintenance Agreement as described below, you agree to use only unmodified Cartridges purchased directly from Xerox or its authorized resellers in the United States and the failure to use such Cartridges shall void any warranty applicable to such Equipment.

F. PC/WORKSTATION REQUIREMENTS. In order to receive Basic Services and/or Software Support for equipment requiring connection to a PC or workstation, you must utilize a PC or workstation that either (1) has been provided by Xerox or (2) meets Xerox's published specifications.

G. DELIVERY AND REMOVAL. Xerox will be responsible for all standard delivery and removal charges. You will be responsible for any non-standard delivery or removal charges incurred.

5. WARRANTY DISCLAIMER & WAIVERS. XEROX DISCLAIMS, AND YOU WAIVE, THE IMPLIED WARRANTIES OF NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE.

6. INTELLECTUAL PROPERTY INDEMNITY. Xerox, at its expense, will defend you from, and pay any settlement agreed to by Xerox or any final judgment for, any claim that a Xerox-brand Product infringes a third party's U.S. intellectual property rights provided you promptly notify Xerox of the alleged infringement and permit Xerox to direct the defense. Xerox is not responsible for any non-Xerox litigation expenses or settlements unless it preapproves them in writing. To avoid infringement, Xerox may modify or substitute an equivalent Xerox-brand Product, refund the price paid for the Xerox-brand Product (less the reasonable rental value for the period it was available to you), or obtain any necessary licenses. Xerox is not liable for any infringement-related liabilities outside the scope of this Section including, but not limited to, infringement based upon a Xerox-brand Product being modified to your specifications or being used or sold with products not provided by Xerox.

7. LIMITATION OF LIABILITY. Xerox shall not be liable to you for any direct damages in excess of $10,000 or the amounts paid hereunder, whichever is greater, and neither party shall be liable to the other for any special, indirect, incidental, consequential or punitive damages arising out of or relating to this Agreement, whether the claim alleges tortious conduct (including negligence) or any other legal theory. The above-stated limitation of liability shall not be applicable to any specific indemnification obligations set forth in this Agreement. Any action you take against Xerox must be commenced within two (2) years after the event that caused it.

8. ASSIGNMENT.

A. If you wish to assign any rights or obligations under this Agreement, you shall provide a written notice to Xerox of such request for consent, with said notice including the name of the proposed assignee. Your request to assign this Agreement will be granted by Xerox if: (1) you are not in default under this Agreement or any other agreement with Xerox; (2) the proposed assignee agrees to the Section of this Agreement titled "PAYMENT, TAXES & CREDIT HISTORY" as applicable to it, for the purposes of the proposed assignment; (3) the proposed assignee meets Xerox's then current credit criteria for similar transactions as determined by Xerox in its sole discretion; and, (4) you and the proposed assignee execute a writing, in a form acceptable to Xerox, confirming said assignment. Assignment by you requires the written consent of Xerox and may not be accomplished by operation of law.

B. Xerox may assign this Agreement, in whole or in part, to a parent, subsidiary or affiliate of Xerox, or to a person or entity for the purposes of securitizing a pool of assets or as part of a third party financial transaction without prior notice to you; provided, however, any proposed assignment to a person or entity not identified previously in this sentence shall require your prior written consent. In the event of an assignment permitted by the preceding sentence, Xerox, without notice to you, may release information it has about you related to this Agreement. Each successive assignee of Xerox shall have all of the rights but none of the obligations of Xerox hereunder. You shall continue to look to Xerox for performance of Xerox's obligations, including the provision of Basic Services,

Xerox Form# 51858t&c (05/2005)

and you hereby waive and release any claim or suit against Xerox relating to or arising from the performance of Xerox's obligations hereunder. You shall not assert any defense, counterclaim or setoff that you may have or claim against Xerox against any assignees of Xerox. In the event of an assignment by Xerox, you shall remit payments due in accordance with remittance instructions of the assignee.

9.   DEFAULT & REMEDIES; LATE CHARGES & COLLECTION COSTS.

A.   For any payment not received by Xerox within ten (10) days of the due date as set forth herein, Xerox may charge, and you agree to pay, a late charge equal to the higher of five percent (5%) of the amount due or $25 (not to exceed the maximum permitted by law) as reasonable collection costs.

B.   You will be in default under this Agreement if (1) Xerox does not receive any payment within fifteen (15) days after the date it is due or (2) if you breach any other obligation hereunder.  If you default, Xerox, in addition to its other remedies (including the cessation of Basic Services), may require immediate payment, as liquidated damages for loss of bargain and not as a penalty, of (a) all amounts then due, plus interest on all amounts due from the due date until paid at the rate of one and one-half percent (1.5%) per month (not to exceed the maximum amount permitted by law); (b) the remaining Installment Sale Payments in the Agreement's term less any unearned finance charges (as reflected on Xerox's books and records) if the Equipment is being purchased on an installment basis; (c) the lesser of the remaining Minimum Periodic Base Charge in the Agreement's term or six (6) such payments for one-year agreements (and twelve (12) such payments for multi-year agreements) if this Agreement includes maintenance; and, (d) all applicable Taxes.  Xerox's decision to waive or forgive a particular default shall not prevent Xerox from declaring any other default.  In addition, if you default under this Agreement, you agree to pay all of the costs Xerox incurs to enforce its rights against you, including reasonable attorneys' fees and actual costs.

10.   REPRESENTATIONS, WARRANTIES & COVENANTS.  Each party represents that, as of the date of this Agreement, it has the lawful power and authority to enter into this Agreement, the individuals signing this Agreement are duly authorized to do so on its behalf and, by entering this Agreement, it will not violate any law or other agreement to which it is a party.  You are not aware of anything that will have a material negative effect on your ability to satisfy your payment obligations under this Agreement and all financial information you have provided, or will provide, to Xerox is true and accurate and provides a good representation of your financial condition.  Each party agrees that it will promptly notify the other party in writing of a change in ownership, if it relocates its principal place of business or changes the name of its business.

11.   NOTICES.  Notices must be in writing and will be deemed given five (5) days after mailing, or two (2) days after sending by nationally recognized overnight courier, to the other party's business address, or to such other address designated by either party to the other by written notice given pursuant to this sentence.  The term "business address" shall mean, for you, the "Bill to" address listed on the first page of this Agreement and, for Xerox, our inquiry address set forth on the most recent invoice to you.

12.   FORCE MAJEURE.  Xerox shall not be liable to you during any period in which its performance is delayed or prevented, in whole or in part, by a circumstance beyond its reasonable control, which circumstances include, but are not limited to, the following: act of God (e.g., flood, earthquake, wind); fire; war; act of a public enemy or terrorist; act of sabotage; strike or other labor dispute; riot; misadventure of the sea; inability to secure materials and / or transportation; or, a restriction imposed by legislation, an order or a rule or regulation of a governmental entity.  If such a circumstance occurs, Xerox shall undertake reasonable action to notify you of the same.

13.   MISCELLANEOUS.  This Agreement shall be construed under the laws of the State of New York (without regard to conflict-of-law principles).  You agree to the jurisdiction and venue of the federal and state courts in Monroe County, New York.  In any action to enforce this Agreement, the parties agree to waive their right to a jury trial.   If a court finds any term of this Agreement to be unenforceable, the remaining terms of this Agreement shall remain in effect Both parties may retain a reproduction (e.g., electronic image, photocopy, facsimile) of this Agreement which shall be admissible in any action to enforce it, but only the Agreement held by Xerox shall be considered an original.  Xerox may accept this Agreement either by its authorized signature or by commencing performance (e.g., Equipment delivery, initiating Basic Services, entering the Maintenance Agreement into billing systems, etc.).  All changes to this Agreement must be made in a writing signed by both parties; accordingly, any terms on your ordering documents shall be of no force or effect. The following four sentences control over every other part of this Agreement and over all other documents now or later pertaining to this Agreement.  We both intend to comply with applicable laws.  In no event will Xerox charge or collect any amounts in excess of those allowed by applicable law.  Any part of this Agreement that would, but for this Section, be read under any circumstances to allow for a charge higher than that allowed under

Xerox Form# 51858t&c (05/2005)

applicable legal limits is limited and modified by this Section to limit the amounts chargeable under this Agreement to the maximum amount allowed under the legal limit.  If, in any circumstances, any amount in excess of that allowed by law is charged or received, any such charge will be deemed limited by the amount legally allowed and any amount received by Xerox in excess of that legally allowed will be applied by us to the payment of amounts legally owed under this Agreement, or refunded to you.

**SALE TERMS:**   The following additional terms apply only to sale transactions:

14.   COMMENCEMENT, TITLE, RISK, AND RELOCATION.

A.   The term for this Agreement and any warranty applicable to the Equipment shall commence upon installation of the Equipment; provided, however, for customer-installable Equipment, the term for this Agreement and any express warranty period applicable to the Equipment shall commence upon equipment delivery date.

B.   Title and risk of loss to Equipment will pass to you upon shipment from a Xerox controlled facility.  Upon passage to you of title to the Equipment, you must comply with all applicable laws and regulations regarding the export of any commodity, technology and/or software.  Until you have paid for the Equipment in full, you agree that:  (1) it shall remain personal property; (2) you will not attach any of it as a fixture to any real estate; (3) you will not pledge, sub-lease or part with possession of it or file or permit to be filed any lien against it; and, (4) you will not make any permanent alterations to it.

C.   Until you have paid for the Equipment in full, you must provide Xerox prior written notice of all Equipment relocations and, upon your request, Xerox may arrange to relocate the Equipment at your expense.  While Equipment is being relocated, you are responsible for all payments required under this Agreement to Xerox.  All parts/materials replaced, including as part of an upgrade, will become Xerox's property.

15.   CARTRIDGES.   Cartridges packed with Equipment and replacement Cartridges may be new, remanufactured or reprocessed.  Remanufactured and reprocessed Cartridges meet Xerox's new Cartridge performance standards and contain new and/or reprocessed components.   To enhance print quality, the Cartridge(s) for many models of Equipment have been designed to cease functioning at a predetermined point.  In addition, many Equipment models are designed to function only with Cartridges that are newly manufactured original Xerox Cartridges or with Cartridges intended for use in the U.S. Equipment configuration which permits use of non-newly manufactured original Xerox Cartridges may be available from Xerox at an additional charge.  Cartridges sold as Environmental Partnership ("EP") Cartridges remain the property of Xerox.  You agree that you shall return all EP Cartridges and may return other Cartridges to Xerox, at Xerox's expense when using Xerox-supplied shipping labels, for remanufacturing once such Cartridges cease functioning.

16.   EQUIPMENT STATUS.  Unless you are acquiring Previously Installed Equipment, Equipment will be either (a) "Newly Manufactured," which may contain some recycled components that are reconditioned; (b) "Factory Produced New Model", which is manufactured and newly serialized at a Xerox factory, adds functions and features to a product previously disassembled to a Xerox predetermined standard, and contains both new components and recycled components that are reconditioned; or (c) "Remanufactured", which has been factory produced following disassembly to a Xerox predetermined standard and contains both new components and recycled components that are reconditioned.

17.   PREPAYMENT OF EQUIPMENT PURCHASED ON INSTALLMENT BASIS.   You may prepay your remaining principal balance on Equipment purchased on an installment basis at any time, thereby eliminating your obligation to pay future finance charges.

18.   PROTECTION OF XEROX'S RIGHTS.   Until you have paid for the Equipment in full, Xerox shall have a purchase money security interest in it and you hereby authorize Xerox or its agents to file, by any permissible means, financing statements necessary to protect its rights in the Equipment.  Xerox may take on your behalf and at your expense any action required to be taken by you under this Agreement and which you fail to take.

**MAINTENANCE TERMS:**   The following additional terms apply only to maintenance transactions:

19.   PRICING INCREASES FOR MULTI-YEAR AGREEMENTS.  Xerox may annually increase the Minimum Periodic Maintenance Payment and Print Charges established under your multi-year maintenance agreement, each such increase not to exceed 10%.  (For state and local government customers, this adjustment shall take place at the commencement of each of your annual contract cycles.)

20. COMMENCEMENT. Maintenance Agreements will commence at the end of any warranty period and expire on the last day of the 12th, 24th, 36th, 48th or 60th full calendar month thereafter, as applicable.

21. MINIMUM MAINTENANCE PAYMENTS. Each Minimum Maintenance Payment includes a Periodic Base Charge, and may include a Periodic Minimum Number of Prints. Minimum Maintenance Payments are billed in advance, with additional Print Charges billed in arrears.

22. RENEWAL. Unless either party provides notice at least thirty (30) days before the end of the term of its intention not to renew this Agreement, it will renew automatically for successive terms of the same number of months, terms and conditions and billing frequency as the original Agreement.  Pricing for this renewal term shall be at Xerox's then-current published pricing.

**SOFTWARE TERMS:**  The following additional terms apply only to transactions covering Application Software and/or Xerox-brand Equipment:

23. SOFTWARE LICENSE.  The following terms apply to copyrighted software and the accompanying documentation, including, but not limited to, operating system software, provided with or within the Xerox-brand Equipment acquired hereunder ("Base Software") as well as software specifically set out as "Application Software" on the face of this Agreement.  This license does not apply to any Diagnostic Software nor to any software / documentation accompanied by a clickwrap or shrinkwrap license agreement or otherwise made subject to a separate license agreement.

A.  Xerox grants you a non-exclusive, non-transferable license to use the Base Software within the United States, its territories, and possessions (the "United States") only on or with the Equipment with which (or within which) it was delivered.  For Application Software, Xerox grants you a non-exclusive, non-transferable license to use this software within the United States on any single unit of equipment for as long as you are current in the payment of any indicated software license fees (including any Annual Renewal Fees).  You have no other rights to the Base or Application Software and, in particular, may not: (1) distribute, copy, modify, create derivatives of, decompile, or reverse engineer this software; (2) activate any software delivered with or within the Equipment in an unactivated state; or, (3) allow others to engage in same.  Title to the Base and Application Software and all copyrights and other intellectual property rights in it shall at all times reside solely with Xerox and/or its licensors (who shall be considered third-party beneficiaries of this Agreement's software and limitation of liability provisions).  Base and Application Software may contain, or be modified to contain, computer code capable of automatically disabling proper operation or functioning of the Equipment.  Such disabling code may be activated if: (i) Xerox is denied reasonable access to the Base or Application Software to periodically reset such code; (ii) you are notified of a default under any term of this Agreement; or, (iii) your license is terminated or expires.

B.  Xerox may terminate your license for any Base Software (1) immediately if you no longer use or possess the Equipment or are a lessor of the Equipment and your first lessee no longer uses or possesses it, or (2) upon the termination of any agreement under which you have rented or leased the Equipment.

C.  If you transfer possession of the Equipment, Xerox will offer the transferee a license to use the Base Software within the United States on or with it, subject to Xerox's then-applicable terms and license fees, if any, and provided the transfer is not in violation of Xerox's rights.

D.  Xerox warrants that the Base and Application Software will perform in material conformity with its user documentation for a ninety (90) day period from the date it is delivered or, for software installed by Xerox, the date of software installation.  Neither Xerox nor its licensors warrant that the Base or Application Software will be free from errors or that its operation will be uninterrupted.

E.  Notwithstanding anything to the contrary set forth in this Agreement, if you enter into a maintenance agreement for Equipment, such maintenance agreement does not include a license for Base Software.  If you do not have a license for Base Software for Equipment, you may enter into a separate license agreement with Xerox for such Base Software.

24. SOFTWARE SUPPORT.  During the period that Xerox (or a designated servicer) provides Basic Services for the Equipment but in no event longer than five (5) years after Xerox stops taking orders from customers for their acquisition of the subject model of Equipment, Xerox (or a designated servicer) will also provide software support for the Base Software under the following terms.  For Application Software licensed pursuant to this Agreement, Xerox will provide this same level of support provided you are current in the payment of all Initial License and Annual Renewal Fees (or, for programs not requiring Annual Renewal Fees, the payment of the Initial License Fee and the annual "Support Only" Fees):

A.  Xerox will assure that Base and Application Software performs in material conformity with its user documentation and will maintain a toll-free hotline during standard business hours to answer related questions.

B.  Xerox may make available new releases of the Base or Application Software that primarily incorporate coding error fixes and are designated as "Maintenance Releases".  Maintenance Releases are provided at no charge and must be implemented within six (6) months after being made available to you.  Each new Maintenance Release shall be considered Base or Application Software governed by these Software Terms.  New releases of the Base or Applications Software that are not Maintenance Releases, if any, may be subject to additional license fees at Xerox's then-current pricing and shall be considered Base or Application Software governed by these Software Terms (unless other wise noted).  Xerox will not be in breach of its software support obligations hereunder if, in order to implement, in whole or in part, a new release of Base or Application Software provided or made available to you by Xerox, you must procure, at your expense, additional hardware and/or software from Xerox or any other entity.  You agree to return or destroy all prior releases.

C.  Xerox will use reasonable efforts, either directly and/or with its vendors, to resolve coding errors or provide workarounds or patches, provided you report problems as specified by Xerox.

D.  Xerox shall not be obligated (1) to support any Base or Application software that is two or more releases older than Xerox's most current release, or (2) to remedy coding errors if you have modified the Base or Application Software.

E.  For Application Software, Xerox may annually increase the Annual Renewal and Support-Only Fees, each such increase not to exceed 10%.  (For state and local-government customers, this adjustment shall take place at the commencement of each of your annual contract cycles.)

F.  DIAGNOSTIC SOFTWARE.  Software used to maintain the Equipment and/or diagnose its failures or substandard performance (collectively "Diagnostic Software") is embedded in, resides on, or may be loaded onto the Equipment.  The Diagnostic Software and method of entry or access to it constitute valuable trade secrets of Xerox.  Title to the Diagnostic Software shall at all times remain solely with Xerox and/or Xerox's licensors.  You agree that (a) your acquisition of the Equipment does not grant you a license or right to use the Diagnostic Software in any manner, and (b) that unless separately licensed by Xerox to do so, you will not use, reproduce, distribute, or disclose the Diagnostic Software for any purpose (or allow third parties to do so).  You agree at all times (including subsequent to the expiration of this Agreement) to allow Xerox to access, monitor, and otherwise take steps to prevent unauthorized use or reproduction of the Diagnostic Software.

**GOVERNMENTAL TERMS:**  The following additional terms apply only to state and local government customers:

25. REPRESENTATIONS & WARRANTIES, FUNDING, TAX TREATMENT & PAYMENT.

A.  REPRESENTATIONS & WARRANTIES.  You hereby represent and warrant, as of the date of this Agreement, that:  (1) you are a State or a fully constituted political subdivision or agency of the State in which you are located and are authorized to enter into, and carry out, your obligations under this Agreement and any other documents required to be delivered in connection with the Agreement (collectively, the "Documents"); (2) the Documents have been duly authorized, executed and delivered by you in accordance with all applicable laws, rules, ordinances and regulations (including, but not limited to, all applicable laws governing open meetings, public bidding and appropriations required in connection with this Agreement and the acquisition of the Equipment) and are valid, legal, binding agreements, enforceable in accordance with their terms and the person(s) signing the Documents have the authority to do so, are acting with the full authorization of your governing body and hold the offices indicated below their signatures, each of which are genuine; (3) the Equipment is essential to the immediate performance of a governmental or proprietary function by you within the scope of your authority and shall be used during the term hereof only by you and only to perform such function; and, (4) your obligations to remit payments under this Agreement constitute a current expense and not a debt under applicable state law and no provision of this Agreement constitutes a pledge of your tax or general revenues and any provision that is so construed by a court of competent jurisdiction is void from the inception of this Agreement.

B.  FUNDING.  You represent and warrant that all payments due and to become due during your current fiscal year are within the fiscal budget of such year and are included within an unrestricted and unencumbered appropriation currently available for the purchase/maintenance of the Equipment, and that it is your intent to use the Equipment for the entire term and to make all payments required under this Agreement.  In the event that (1) through no action initiated by you your legislative body does not appropriate funds for the continuation of this Agreement for any fiscal year after the first fiscal year and has no funds to do so from other

Xerox Form# 51858t&c (05/2005)

sources and (2) you have located a creditworthy assignee acceptable to Xerox in its sole discretion within your general organization who can continue this Agreement, this Agreement may be terminated. To effect this termination, you shall, thirty (30) days prior to the beginning of the fiscal year for which your legislative body does not appropriate funds for such upcoming fiscal year, send Xerox written notice stating that your legislative body failed to appropriate funds and that you have made the required effort to find an assignee. Your notice must be accompanied by payment of all sums then owed through the current year to Xerox under this Agreement and must certify that the canceled Equipment is not being replaced by equipment performing similar functions during the ensuing fiscal year. In addition, you agree at your expense to return the Equipment in good condition to a location designated by Xerox and that, when returned, the Equipment will be free of all liens and encumbrances. You will then be released from your obligations to make any further payments to Xerox beyond those due for the current fiscal year (with Xerox retaining all sums paid to date).

**C. TAX TREATMENT.** This Agreement has been accepted on the basis of your representation that Xerox may claim any interest paid by you as exempt from federal income tax under Section 103(c) of the Code. You agree to comply with the information reporting requirements of Section 149(e) of the Code. Such compliance shall include, but not be limited to, the execution of 8038-G or 8038-GC Information Returns. You hereby appoint Xerox as your agent to maintain, and Xerox agrees to maintain, a complete and accurate record of all assignments of this Agreement in form sufficient to comply with the book entry requirements of Section 149(a) of the Code and the regulations prescribed thereunder from time to time. Should Xerox lose the benefit of this exemption as a result of your failure to comply with or be covered by Section 103(c) or its regulations, then, subject to the availability of funds and upon demand by Xerox, you shall pay Xerox an amount equal to its loss in this regard. At the time of execution of this Agreement, you shall provide Xerox with a properly prepared and executed copy of US Treasury Form 8038 or 8038-GC.

**D. PAYMENT.** Your payment is due within thirty (30) days of our invoice date.

**ADDITIONAL TERMS:** The following additional terms apply only to the extent that you have agreed to one or more of the options described below:

**26. PREPAID INVOICE.** If this option has been selected, you will not be required to pay your Installment Sale Payment during the initial number of months indicated.

**27. CONSUMABLE SUPPLIES INCLUDED IN BASE/PRINT CHARGES.** If this option has been selected, Xerox (or a designated servicer) will provide you with black toner (excluding highlight color toner), black developer, copy Cartridges, and, if applicable, fuser ("Consumable Supplies") throughout the term of this Agreement. For full-color Equipment, Consumable Supplies shall also include, as applicable, color toner and developer. You agree that the Consumable Supplies are Xerox's property until used by you, that you will use them only with the Equipment, that you will either (a) return all Cartridges to Xerox for remanufacturing once they have been run to their cease-function point (at Xerox's expense when using Xerox-supplied shipping labels), and that at the end of the term of this Agreement either (a) you will return any unused Consumable Supplies to Xerox (at Xerox's expense when using Xerox-supplied shipping labels) or (b) destroy them in a manner permitted by applicable law. Should your use of Consumable Supplies exceed Xerox's published yields for these items by more than 10%, you agree that Xerox shall have the right to charge you for any such excess usage. When requested by Xerox, you agree to provide meter readings and inventory of Consumable Supplies in your possession.

**28. REPLACEMENT/MODIFICATION OF PRIOR XEROX AGREEMENT.** If this option has been selected, this Agreement will replace or modify a prior agreement between you and Xerox covering the specified equipment. If it is a replacement agreement, the prior agreement shall be null and void. If it is a modification, the prior agreement shall remain in effect except that any terms presented in this modification agreement that conflict with, or are additive to, any prior agreement shall take precedence over the prior terms for the balance of the Agreement. In addition, modifications requiring a reamortization of installment sale payments may include a one-time administrative/processing charge which will appear on your first bill under this revised arrangement.

**29. XEROX AS FINANCIAL INTERMEDIARY.** If this option has been selected, you are purchasing on an installment basis specifically identified products that were selected by you and that are not sold by Xerox in the normal course of its business. If you have signed a purchase contract for such products, by signing this Agreement you assign your rights, but none of your obligations under such purchase contract to Xerox. With regard to these products, you agree that Xerox is selling them to you "AS IS, WHERE IS" and that XEROX HAS NOT MADE, AND YOU HEREBY WAIVE, ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES WHATSOEVER, INCLUDING, WITHOUT LIMITATION, (a) ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE OR NON-INFRINGEMENT, and (b) ANY REPRESENTATION OR WARRANTY REGARDING THE PRODUCTS' SUITABILITY, DESIGN, CONDITION, DURABILITY, OPERATION, QUALITY OF MATERIALS OR WORKMANSHIP, OR COMPLIANCE WITH SPECIFICATIONS OR APPLICABLE LAW. Xerox assigns to you, to the extent assignable, any warranty rights it has to these products (which rights shall revert to Xerox if you breach this Agreement). You agree (1) that these products are not covered by Xerox's obligation to provide Basic Services; (2) to maintain a service agreement for these products with a service provider acceptable to Xerox throughout this Agreement's term; (3) to pay all personal property taxes related to these products; and, (4) to assign to Xerox any rights you have to these products until title passes from Xerox to you (which, subject to any software licenses surrounding the acquisition of these products, shall occur when you obtain title to all Xerox-brand Equipment covered by this Agreement).

**30. FINANCED SOFTWARE TOTAL.** If this option has been selected, the initial license fees for any Application Software set forth in this Agreement shall be included in the amount financed on an installment basis and be paid for through your Installment Sale Payments. If you breach this license or any of your obligations regarding the Equipment, the full amount of the initial license fees shall be immediately due and payable.

**31. FINANCED SUPPLIES TOTAL.** If this option has been selected, the cost of any supplies you have purchased under this Agreement shall be included in the amount financed on an installment basis and shall be paid for through your Installment Sale Payments. If you breach any of your obligations regarding the Equipment, the full amount of the supply costs shall become immediately due and payable.

**32. REFINANCE OF PRIOR AGREEMENT.** If this option has been selected, the balance of your prior indicated agreement with Xerox or a third party shall be included in the amount financed on an installment basis and shall be paid for through your Installment Sale Payments. If your prior agreement is with a third party, you hereby acknowledge that you have the right to terminate the agreement and agree to provide a statement from the third party identifying the equipment at issue and the amount to be paid off (as well as a statement from you identifying the payee and mailing address for your payoff check). If your prior agreement was with Xerox, the use of this refinance option shall render your prior agreement null and void. If you breach this Agreement, the full amount of your prior agreement balance shall be immediately due and payable.

**33. ADJUSTMENT PERIOD.** If this option has been selected, the amount you pay Xerox to maintain the Equipment will be adjusted in accordance with the information contained in the Adjustment Period portion of this Agreement; as a result, your initial periodic maintenance payments shall be different from those payable during the balance of this Agreement.

**34. K-16 BILLING SUSPENSION.** If this option has been selected, your Minimum Periodic Base Charges and Print Charges will be suspended each year during the months indicated. During these months, you agree not to use the Equipment and that Xerox shall not be responsible for providing Basic Services on it. If Xerox provides Basic Services during the K-16 Billing Suspension period, you will be billed at Xerox's then-current Time and Materials ("T&M") rates for such Basic Services.

**35. TRADE-IN EQUIPMENT.** If this option has been selected, you are providing equipment to Xerox as part of this Agreement ("Trade-In Equipment") and the following shall apply:

**A. TITLE TRANSFER.** You warrant that you have the right to transfer title to the Trade-In Equipment and that it has been installed and performing its intended function. Title and risk of loss to the Trade-In Equipment shall pass to Xerox when Xerox removes it from your premises.

**B. CONDITION.** You warrant that the Trade-In Equipment is in good working order, has not been modified from its original configuration (other than by Xerox), and has a UL label attached. You agree to maintain the Trade-In Equipment at its present site and in substantially its present condition until removed by Xerox.

**C. ACCRUED CHARGES.** You agree to pay all accrued charges for the Trade-In Equipment (up to and including payment of the Final Principal Payment) Number and to pay all maintenance, administrative, supply, and finance charges for this equipment through the date title passes to Xerox.

**36. RUN LENGTH PLAN.** If this option has been selected, the first ten prints of each original (per run) are recorded and billed on both meters with all subsequent prints recorded and billed on Meter A only.

Xerox Form# 51858t&c (05/2005)

Page __ of __

37. FIXED PRICE PLAN. If this option has been selected, Xerox will forego any right to increase the amount you pay Xerox to maintain the Equipment throughout the initial term of this Agreement.

38. PER-FOOT PRICING. If this option has been selected, all Print Charges will be billed on a per-foot basis, with each linear or square foot, as applicable, equal to one print.

39. ANNUAL CHARGE PLAN. If this option has been selected, the Base Charge for your maintenance plan will be billed annually in advance.

40. EXTENDED SERVICE HOURS. If this option has been selected, Xerox will provide Basic Services during the hours indicated, with the first number establishing the number of eight-hour shifts covered and the second establishing the days of the week (e.g., 2 x 6 would provide service from 8:00 A.M. to 11:59 P.M., Monday through Saturday). The cost of this enhanced service coverage will be billed separately and, as such, is not included in your Minimum Periodic Base Charge or Print Charges.

41. STANDARD MAINTENANCE AGREEMENT. If this option has been selected, Xerox will provide Basic Services for the Equipment subject to your payment of the indicated annual periodic base charge (which in all cases is nonrefundable) along with a standardized per-call charge established by Xerox (which is subject to adjustment by Xerox at its discretion).

42. ATTACHED ADDENDA. If this option has been selected, you acknowledge that one or more specified addenda (as indicated) have been provided to you. These addenda, which provide additional terms relevant to the transactions covered hereunder, are hereby fully integrated into this Agreement.

43. NEGOTIATED CONTRACT. If this option has been selected, the Products identified in this Agreement are subject solely to the terms contained in (a) either (1) the identified Negotiated Contract for the applicable sale and / or maintenance transaction or (2) if there are no such terms in the Negotiated Contract, the terms set forth in this Agreement, and, if applicable and notwithstanding anything to the contrary set forth in the Negotiated Contract, (b) the "Additional Terms" portion of this Agreement for the selected option or options to the extent the subject matter of any such selected option is not addressed in the Negotiated Contract.

44. DSA CONTRACT NUMBER. If a DSA Contract Number has been inserted, the Equipment and/or software identified in this Agreement are associated with the Services being provided under the referenced Document Services Agreement ("DSA"), but such Equipment and/or software are subject solely to the terms contained in this Agreement.


**For customer support tools to manage your account online, visit your Account Management link @ www.xerox.com**

# EXHIBIT C

**Full Legal Name**

| | |
|---|---|
| Customer Name (Bill to) | Universal Wilde |
| DBA/Name Overflow | |
| Street Address | 201 Summer Street |
| Box#/Routing | |
| City, State | Holliston, MA |
| Zip Code | - |
| Tax ID# | |

| | |
|---|---|
| Customer Name (Install) | Universal Wilde |
| DBA/Name Overflow (if req'd) | |
| Installed at Street Address | 201 Summer Street |
| Floor/Room/Routing | |
| City, State | Holliston, MA |
| Zip Code | - |
| County Installed In | |
| Customer Requested Install Date | |

**Cash Sale/Installment Sale - Payment Information**

**Check all that apply**
- [ ] Assoc./Coop. Name:
- [ ] Negotiated Contract #: _____ [ ] DSA Contract #: -
- [ ] Attached Customer P.O. #s: Supplies:
- Sale/Install: _____ Maint:
- [ ] State or Local Government Customer
- [x] **Replacement/Modification of Prior Xerox Agreement**
  Agreement covering Xerox Equipment Serial# (or XS#):
  is hereby [ ] modified [ ] replaced Effective Date:
  Comments:
- [ ] **Installment Sales Information** Install. Sale Term: _____ months
  Int. Rate: __% Total Int.Payable $
  - [ ] Prepaid Invoice: _____ months
  - [ ] Refin. of Prior Agrmt.:[ ] Xerox (XS#): _____ [ ] 3rd Party Eq.
  Amt Refin: $ _____ Int Rate: % _____ Total Int Payable: $
- [ ] **Maintenance Information** Maintenance Term: _____ months
  - [ ] Supplies included in Base/Print Charges

| Product (with serial number, if in place equipment) | Qty | Prev Install | Fin'l Interm | Warr # no | List Price (Total) | Down Payment | Total Discount (Inc. Trade-In) | Net Price (Total) |
|---|---|---|---|---|---|---|---|---|
| 1gen 150 | | [ ] | [ ] | | $ | $ | $ | $ |
| KRD004698 | | [ ] | [ ] | | $ | $ | $ | $ |
| 83L648371 | | [ ] | [ ] | | $ | $ | $ | $ |
| | | [ ] | [ ] | | $ | $ | $ | $ |
| | | [ ] | [ ] | | $ | $ | $ | $ |

| $ | INSTALLMENT SALE PAYMENT (excl. of applic. taxes) | Payment Frequency [ ] Monthly [ ] Other: |
|---|---|---|

Payment Mode [ ] Advance [ ] Arrears

**Maintenance Agreement Price Information** [ ] Adjustment Period (Maintenance Agreement Only)

| | | Period A - Mos. Affected: - | | Period B - Mos. Affected: - | |
|---|---|---|---|---|---|
| Periodic Base Charge | $ | Periodic Base Charge | $ | Periodic Base Charge | $ |
| Print Charge Meter 1: | | Print Charge Meter 1: | | Print Charge Meter 1: | |
| Prints 1 - | $ | Prints 1 - | $ | Prints 1 - | $ |
| Prints - | $ | Prints - | $ | Prints - | $ |
| Prints - | $ | Prints - | $ | Prints - | $ |
| Print Charge Meter 2: | | Print Charge Meter 2: | | Print Charge Meter 2: | |
| Prints 1 - | $ | Prints 1 - | $ | Prints 1 - | $ |
| Prints - | $ | Prints - | $ | Prints - | $ |
| Periodic Min.# of Prints (based on Meter 1 Print Charges) | | Periodic Min.# of Prints (based on Meter 1 Print Charges) | | Periodic Min.# of Prints (based on Meter 1 Print Charges) | |

- [ ] Purchased Supplies [ ] Cash [ ] Fin'd

| Reorder # | Qty | Description | Price |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | Total Price = | $ |

- [ ] **Application Software**

| Software Title | Initial License Fee [ ] Cash [ ] Finance | Annual Renewal Fee [ ] Support Only |
|---|---|---|
| | $ | $ |
| | $ | $ |
| | $ | $ |
| Total Initial License Fees = | $ | |

- [ ] Trade-In Allowance

| Manufacturer | Model/Serial # | Final Principal Payment #: | Allowance |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |
| | Total Allowance = | | $ |

Total Allowance Applied to:
- [ ] Trade-In Equip. Balance: $
- [ ] Price of Replacement Equip.: $

- [ ] K-16 Billing
  Suspension (check 1 as required)
  Months affected
  - [ ] June only
  - [ ] July only
  - [ ] August only
  - [ ] June - July
  - [ ] July - August

**Additional Options (check all that apply)**
- [ ] Run Length Plan [ ] Fixed Price Plan
- [ ] Per-Foot Pricing [ ] Quarterly Bill Plan
- [x] Extended Service Hours
  Description: 3x7 / $ 1200 mo.
- [ ] Std. Maint. Agrmt.: $ _____ / year
- [ ] Attached Addenda:
- [ ] Other Addenda:

**Agreement Presented By:**
Xerox Name: _____ Phone: _____

FOR AUTHORIZED HQ INTERNAL USE ONLY
Accepted _____ Xerox Corporation
By _____
Division of Administrative Services
Title _____ Date _____
Worksheet _____ Unit _____

www.xerox.com

CUSTOMER ACKNOWLEDGES RECEIPT OF THE TERMS OF THIS AGREEMENT (CONSISTING OF 6 PAGES INCLUDING THIS FACE PAGE)
Auth. Signer Name: Jeff McFADDN   VP Manufacturing
(Please Print Name of Authorized Signer)
Signature: _____ Date: 10/1/14
(Signature of Authorized Signer)
Auth. Signer Title: _____ Phone: _____
E-Mail: _____
[x] Tax Exempt (*Must attach Sales Tax Exemption Certificate)

<u>GENERAL TERMS:</u> These terms do not apply to on-site and maintenance transactions:

**1. PRODUCTS.** The term "Products" shall refer collectively to all equipment (the "Equipment"), software, and supplies ordered under this Agreement. You represent that the Products are being ordered for your own business use (rather than resale) and that they will not be used for personal, household or family purposes.

**2. NON-CANCELABLE AGREEMENT.** THIS AGREEMENT CANNOT BE CANCELED OR TERMINATED EXCEPT AS EXPRESSLY PROVIDED HEREIN. YOUR OBLIGATION TO MAKE ALL PAYMENTS AND TO PAY ANY OTHER AMOUNTS DUE OR TO BECOME DUE SHALL BE ABSOLUTE AND UNCONDITIONAL AND SHALL NOT BE SUBJECT TO ANY DELAY, REDUCTION, SET-OFF, DEFENSE, COUNTERCLAIM OR RECOUPMENT FOR ANY REASON WHATSOEVER, IRRESPECTIVE OF XEROX'S PERFORMANCE OF ITS OBLIGATIONS HEREUNDER. ANY CLAIM AGAINST XEROX MAY BE ASSERTED IN A SEPARATE ACTION AND SOLELY AGAINST XEROX.

**3. PAYMENT, TAXES & CREDIT HISTORY.**

A. Invoices are payable upon receipt and you agree to pay Xerox each Net Price amount or Installment Sale Payment (as applicable), each Minimum Periodic Base Charge, all Print Charges and all other sums due as follows: (i) if the invoice displays a due date, payment is due and must be received by Xerox on or before said due date, or (ii) if the invoice does not display a due date, payment is due and must be received by Xerox no later than thirty (30) days after the invoice date. Restrictive covenants on instruments or documents submitted for or with payments you send to Xerox will not reduce your obligations.

B. You shall be responsible for any and all applicable Taxes, which will be included in Xerox's invoice unless you provide proof of your tax exempt status. "Taxes" shall mean any tax, assessment or charge imposed or collected by any governmental entity or any political subdivision thereof, however designated or levied, imposed on this Agreement or the amounts payable to Xerox by you for the billing of Products, Print Charges, services and maintenance of any kind; Taxes include, but are not limited to, sales and use, rental, excise, gross receipts and occupational or privilege taxes, plus any interest and/or penalty thereon, but excluding any taxes on Xerox's net income. If a taxing authority determines that Xerox did not collect all applicable Taxes, you shall remain liable to Xerox for such additional Taxes.

C. You, to the extent required by applicable law, authorize Xerox (or its agent) to obtain credit reports, make such other credit inquiries as Xerox may deem necessary at any time, furnish payment history information to credit reporting agencies, and release to prospective assignees of this Agreement or any rights hereunder credit-related information Xerox has about you and this Agreement. Even if Products have been delivered, Xerox may, within sixty (60) days following its acceptance of this Agreement, revoke the Agreement if your credit approval is denied.

**4. BASIC SERVICES.** Xerox (or a designated servicer) will provide the following Basic Services under an express warranty or maintenance agreement (unless you are acquiring Equipment for which Xerox does not offer Basic Services; such Equipment to be designated as "No Svc."):

A. REPAIRS & PARTS. Xerox will make repairs and adjustments necessary to keep Equipment in good working order (including such repairs or adjustments required during initial installation). Parts required for repair may be new, reprocessed, or recovered.

B. HOURS & EXCLUSIONS. Unless otherwise stated, Basic Services will be provided during Xerox's standard working hours (excluding Xerox-recognized holidays) in areas within the United States, its territories, and possessions open for repair service for the Equipment at issue. You agree to give Xerox reasonable access to the Equipment. Basic Services shall cover repairs and adjustments required as a result of normal wear and tear or defects in materials or workmanship (and shall exclude repairs or adjustments Xerox determines to relate to or be affected by the use of options, accessories, or other connected products not serviced by Xerox, as well as any non-Xerox alterations, relocation, service, supplies, or consumables). You agree to use Equipment in accordance with, and to perform all operator maintenance procedures for Equipment as set forth in, the applicable manuals provided by Xerox.

C. INSTALLATION SITE & METER READINGS. The Equipment installation site must conform to Xerox's published requirements throughout the term of this Agreement. If applicable, you agree to provide meter readings in the manner prescribed by Xerox. If you do not provide Xerox with meter readings as required, Xerox may estimate them and bill you accordingly.

D. MAINTENANCE REQUIREMENTS. If Xerox is unable to maintain the Equipment as described above, Xerox will, as your exclusive remedy for Xerox's failure to provide Basic Services, replace the Equipment with an identical product or, at Xerox's option, another product of equal or greater capabilities. If a replacement product is provided pursuant to this Section, there will not be an additional charge for the replacement product and, except as set forth in the Section of this Agreement titled "PRICING INCREASES FOR MULTI-YEAR AGREEMENTS", there will not be an additional charge for Basic Services during the then-current term during which Basic Services are being provided.

E. CARTRIDGE PRODUCTS. If Xerox is providing Basic Services for Equipment utilizing cartridges designated by Xerox as customer replaceable units, including copy/print cartridges and xerographic modules or fuser modules ("Cartridges")), and unless you have entered into a Standard Maintenance Agreement as described below, you agree to use only unmodified Cartridges purchased directly from Xerox or its authorized resellers in the United States and the failure to use such Cartridges shall void any warranty applicable to such Equipment.

F. PC/WORKSTATION REQUIREMENTS. In order to receive Basic Services and/or Software Support for equipment requiring connection to a PC or workstation, you must utilize a PC or workstation that either (1) has been provided by Xerox or (2) meets Xerox's published specifications.

G. DELIVERY AND REMOVAL. Xerox will be responsible for all standard delivery and removal charges. You will be responsible for any non-standard delivery or removal charges incurred.

**5. WARRANTY DISCLAIMER & WAIVERS.** XEROX DISCLAIMS, AND YOU WAIVE, THE IMPLIED WARRANTIES OF NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE.

**6. INTELLECTUAL PROPERTY INDEMNITY.** Xerox, at its expense, will defend you from, and pay any settlement agreed to by Xerox or any final judgment for, any claim that a Xerox-brand Product infringes a third party's U.S. intellectual property rights provided you promptly notify Xerox of the alleged infringement and permit Xerox to direct the defense. Xerox is not responsible for any non-Xerox litigation expenses or settlements unless it preapproves them in writing. To avoid infringement, Xerox may modify or substitute an equivalent Xerox-brand Product, refund the price paid for the Xerox-brand Product (less the reasonable rental value for the period it was available to you), or obtain any necessary licenses. Xerox is not liable for any infringement-related liabilities outside the scope of this Section including, but not limited to, infringement based upon a Xerox-brand Product being modified to your specifications or being used or sold with products not provided by Xerox.

**7. LIMITATION OF LIABILITY.** Xerox shall not be liable to you for any direct damages in excess of $10,000 or the amounts paid hereunder, whichever is greater, and neither party shall be liable to the other for any special, indirect, incidental, consequential or punitive damages arising out of or relating to this Agreement, whether the claim alleges tortious conduct (including negligence) or any other legal theory. The above-stated limitation of liability shall not be applicable to any specific indemnification obligations set forth in this Agreement. Any action you take against Xerox must be commenced within two (2) years after the event that caused it.

**8. ASSIGNMENT.**

A. If you wish to assign any rights or obligations under this Agreement, you shall provide a written notice to Xerox of such request for consent, with said notice including the name of the proposed assignee. Your request to assign this Agreement will be granted by Xerox if: (1) you are not in default under this Agreement or any other agreement with Xerox; (2) the proposed assignee agrees to the Section of this Agreement titled "PAYMENT, TAXES & CREDIT HISTORY" as applicable to it, for the purposes of the proposed assignment; (3) the proposed assignee meets Xerox's then current credit criteria for similar transactions as determined by Xerox in its sole discretion; and, (4) you and the proposed assignee execute a writing, in a form acceptable to Xerox, confirming said assignment. Assignment by you requires the written consent of Xerox and may not be accomplished by operation of law.

B. Xerox may assign this Agreement, in whole or in part, to a parent, subsidiary or affiliate of Xerox, or to a person or entity for the purposes of securitizing a pool of assets or as part of a third party financial transaction without prior notice to you; provided, however, any proposed assignment to a person or entity not identified previously in this sentence shall require your prior written consent. In the event of an assignment permitted by the preceding sentence, Xerox, without notice to you, may release information it has about you related to this Agreement. Each successive assignee of Xerox shall have all of the rights but none of the obligations of Xerox hereunder. You shall continue to look to Xerox for performance of Xerox's obligations, including the provision of Basic Services,

Xerox Form# 51858t&c (05/2005)

and you hereby waive and release any rights you may have relating to or arising from the performance of Xerox's obligations hereunder. You shall not assert any defense, counterclaim or setoff that you may have or claim against Xerox against any assignees of Xerox. In the event of an assignment by Xerox, you shall remit payments due in accordance with remittance instructions of the assignee.

### 9.  DEFAULT & REMEDIES; LATE CHARGES & COLLECTION COSTS.

A.  For any payment not received by Xerox within ten (10) days of the due date as set forth herein, Xerox may charge, and you agree to pay, a late charge equal to the higher of five percent (5%) of the amount due or $25 (not to exceed the maximum amount permitted by law) as reasonable collection costs.

B.  You will be in default under this Agreement if (1) Xerox does not receive any payment within fifteen (15) days after the date it is due or (2) if you breach any other obligation hereunder.  If you default, Xerox, in addition to its other remedies (including the cessation of Basic Services), may require immediate payment, as liquidated damages for loss of bargain and not as a penalty, of (a) all amounts then due, plus interest on all amounts from the due date until paid at the rate of one and one-half percent (1.5%) per month (not to exceed the maximum amount permitted by law); (b) the remaining Installment Sale Payments in the Agreement's term less any unearned finance charges (as reflected on Xerox's books and records) if the Equipment is being purchased on an installment basis; (c) the lesser of the remaining Minimum Periodic Base Charge in the Agreement's term or six (6) such payments for one-year agreements (and twelve (12) such payments for multi-year agreements) if this Agreement includes maintenance; and, (d) all applicable Taxes.  Xerox's decision to waive or forgive a particular default shall not prevent Xerox from declaring any other default.  In addition, if you default under this Agreement, you agree to pay all of the costs Xerox incurs to enforce its rights against you, including reasonable attorneys' fees and actual costs.

### 10.  REPRESENTATIONS, WARRANTIES & COVENANTS.  Each party represents that, as of the date of this Agreement, it has the lawful power and authority to enter into this Agreement, the individuals signing this Agreement are duly authorized to do so on its behalf and, by entering this Agreement, it will not violate any law or other agreement to which it is a party.  You are not aware of anything that will have a material negative effect on your ability to satisfy your payment obligations under this Agreement and all financial information you have provided, or will provide, to Xerox is true and accurate and provides a good representation of your financial condition.  Each party agrees that it will promptly notify the other party in writing of a change in ownership, if it relocates its principal place of business or changes the name of its business.

### 11.  NOTICES.  Notices must be in writing and will be deemed given five (5) days after mailing, or two (2) days after sending by nationally recognized overnight courier, to the other party's business address, or to such other address designated by either party to the other by written notice given pursuant to this sentence.  The term "business address" shall mean, for you, the "Bill to" address listed on the first page of this Agreement and, for Xerox, our inquiry address set forth on the most recent invoice to you.

### 12.  FORCE MAJEURE.  Xerox shall not be liable to you during any period in which its performance is delayed or prevented, in whole or in part, by a circumstance beyond its reasonable control, which circumstances include, but are not limited to, the following: act of God (e.g., flood, earthquake, wind); fire; war; act of a public enemy or terrorist; act of sabotage; strike or other labor dispute; riot; misadventure of the sea; inability to secure materials and / or transportation; or, a restriction imposed by legislation, an order or a rule or regulation of a governmental entity.  If such a circumstance occurs, Xerox shall undertake reasonable action to notify you of the same.

### 13.  MISCELLANEOUS.  This Agreement shall be construed under the laws of the State of New York (without regard to conflict-of-law principles).  You agree to the jurisdiction and venue of the federal and state courts in Monroe County, New York.  In any action to enforce this Agreement, the parties agree to waive their right to a jury trial.  If a court finds any term of this Agreement to be unenforceable, the remaining terms of this Agreement shall remain in effect Both parties may retain a reproduction (e.g., electronic image, photocopy, facsimile) of this Agreement which shall be admissible in any action to enforce it, but only the Agreement held by Xerox shall be considered an original.  Xerox may accept this Agreement either by its authorized signature or by commencing performance (e.g., Equipment delivery, initiating Basic Services, entering the Maintenance Agreement into billing systems, etc.).  All changes to this Agreement must be made in a writing signed by both parties; accordingly, any terms on your ordering documents shall be of no force or effect. The following four sentences control over every other part of this Agreement and over all other documents now or later pertaining to this Agreement.  We both intend to comply with applicable laws.  In no event will Xerox charge or collect any amounts in excess of those allowed by applicable law.  Any part of this Agreement that would, but for this Section, be read under any circumstances to allow for a charge higher than that allowed under

applicable law will instead be limited and reduced by this action to limit the amounts chargeable under this Agreement to the maximum amount allowed under the legal limit.  If, in any circumstances, any amount in excess of that allowed by law is charged or received, any such charge will be deemed limited by the amount legally allowed and any amount received by Xerox in excess of that legally allowed will be applied by us to the payment of amounts legally owed under this Agreement, or refunded to you.

**SALE TERMS:**  The following additional terms apply only to sale transactions:

### 14.  COMMENCEMENT, TITLE, RISK, AND RELOCATION.

A.  The term for this Agreement and any warranty applicable to the Equipment shall commence upon installation of the Equipment; provided, however, for customer-installable Equipment, the term for this Agreement and any express warranty period applicable to the Equipment shall commence upon equipment delivery date.

B.  Title and risk of loss to Equipment will pass to you upon shipment from a Xerox controlled facility.  Upon passage to you of title to the Equipment, you must comply with all applicable laws and regulations regarding the export of any commodity, technology and/or software.  Until you have paid for the Equipment in full, you agree that: (1) it shall remain personal property; (2) you will not attach any of it as a fixture to any real estate; (3) you will not pledge, sub-lease or part with possession of it or file or permit to be filed any lien against it; and, (4) you will not make any permanent alterations to it.

C.  Until you have paid for the Equipment in full, you must provide Xerox prior written notice of all Equipment relocations and, upon your request, Xerox may arrange to relocate the Equipment at your expense.  While Equipment is being relocated, you are responsible for all payments required under this Agreement to Xerox.  All parts/materials replaced, including as part of an upgrade, will become Xerox's property.

### 15.  CARTRIDGES.  Cartridges packed with Equipment and replacement Cartridges may be new, remanufactured or reprocessed.  Remanufactured and reprocessed Cartridges meet Xerox's new Cartridge performance standards and contain new and/or reprocessed components.  To enhance print quality, the Cartridge(s) for many models of Equipment have been designed to cease functioning at a predetermined point.  In addition, many Equipment models are designed to function only with Cartridges that are newly manufactured original Xerox Cartridges or with Cartridges intended for use in the U.S. Equipment configuration which permits use of non-newly manufactured original Xerox Cartridges may be available from Xerox at an additional charge.  Cartridges sold as Environmental Partnership ("EP") Cartridges remain the property of Xerox.  You agree that you shall return all EP Cartridges and may return other Cartridges to Xerox, at Xerox's expense when using Xerox-supplied shipping labels, for remanufacturing once such Cartridges cease functioning.

### 16.  EQUIPMENT STATUS.  Unless you are acquiring Previously Installed Equipment, Equipment will be either (a) "Newly Manufactured," which may contain some recycled components that are reconditioned; (b) "Factory Produced New Model", which is manufactured and newly serialized at a Xerox factory, adds functions and features to a product previously disassembled to a Xerox predetermined standard, and contains both new components and recycled components that are reconditioned; or (c) "Remanufactured", which has been factory produced following disassembly to a Xerox predetermined standard and contains both new components and recycled components that are reconditioned.

### 17.  PREPAYMENT OF EQUIPMENT PURCHASED ON INSTALLMENT BASIS.  You may prepay your remaining principal balance on Equipment purchased on an installment basis at any time, thereby eliminating your obligation to pay future finance charges.

### 18.  PROTECTION OF XEROX'S RIGHTS.  Until you have paid for the Equipment in full, Xerox shall have a purchase money security interest in it and you hereby authorize Xerox or its agents to file, by any permissible means, financing statements necessary to protect its rights in the Equipment.  Xerox may take on your behalf and at your expense any action required to be taken by you under this Agreement and which you fail to take.

**MAINTENANCE TERMS:**  The following additional terms apply only to maintenance transactions:

### 19.  PRICING INCREASES FOR MULTI-YEAR AGREEMENTS.  Xerox may annually increase the Minimum Periodic Maintenance Payment and Print Charges established under your multi-year maintenance agreement, each such increase not to exceed 10%.  (For state and local government customers, this adjustment shall take place at the commencement of each of your annual contract cycles.)

Xerox Form# 51858t&c (05/2005)

20. COMMENCEMENT. The Initial Term shall commence at the end of any warranty period and expire on the last day of the 12th, 24th, 36th, 48th or 60th full calendar month thereafter, as applicable.

21. MINIMUM MAINTENANCE PAYMENTS. Each Minimum Maintenance Payment includes a Periodic Base Charge, and may include a Periodic Minimum Number of Prints. Minimum Maintenance Payments are billed in advance, with additional Print Charges billed in arrears.

22. RENEWAL. Unless either party provides notice at least thirty (30) days before the end of the term of its intention not to renew this Agreement, it will renew automatically for successive terms of the same number of months, terms and conditions and billing frequency as the original Agreement. Pricing for this renewal term shall be at Xerox's then-current published pricing.

**SOFTWARE TERMS:** The following additional terms apply only to transactions covering Application Software and/or Xerox-brand Equipment:

23. SOFTWARE LICENSE. The following terms apply to copyrighted software and the accompanying documentation, including, but not limited to, operating system software, provided with or within the Xerox-brand Equipment acquired hereunder ("Base Software") as well as software specifically set out as "Application Software" on the face of this Agreement. This license does not apply to any Diagnostic Software nor to any software / documentation accompanied by a clickwrap or shrinkwrap license agreement or otherwise made subject to a separate license agreement.

A. Xerox grants you a non-exclusive, non-transferable license to use the Base Software within the United States, its territories, and possessions (the "United States") only on or with the Equipment with which (or within which) it was delivered. For Application Software, Xerox grants you a non-exclusive, non-transferable license to use this software within the United States on any single unit of equipment for as long as you are current in the payment of any indicated software license fees (including any Annual Renewal Fees). You have no other rights to the Base or Application Software and, in particular, may not: (1) distribute, copy, modify, create derivatives of, decompile, or reverse engineer this software; (2) activate any software delivered with or within the Equipment in an unactivated state; or, (3) allow others to engage in same. Title to the Base and Application Software and all copyrights and other intellectual property rights in it shall at all times reside solely with Xerox and/or its licensors (who shall be considered third-party beneficiaries of this Agreement's software and limitation of liability provisions). Base and Application Software may contain, or be modified to contain, computer code capable of automatically disabling proper operation or functioning of the Equipment. Such disabling code may be activated if: (i) Xerox is denied reasonable access to the Base or Application Software to periodically reset such code; (ii) you are notified of a default under any term of this Agreement; or, (iii) your license is terminated or expires.

B. Xerox may terminate your license for any Base Software (1) immediately if you no longer use or possess the Equipment or are a lessor of the Equipment and your first lessee no longer uses or possesses it, or (2) upon the termination of any agreement under which you have rented or leased the Equipment.

C. If you transfer possession of the Equipment, Xerox will offer the transferee a license to use the Base Software within the United States on or with it, subject to Xerox's then-applicable terms and license fees, if any, and provided the transfer is not in violation of Xerox's rights.

D. Xerox warrants that the Base and Application Software will perform in material conformity with its user documentation for a ninety (90) day period from the date it is delivered or, for software installed by Xerox, the date of software installation. Neither Xerox nor its licensors warrant that the Base or Application Software will be free from errors or that its operation will be uninterrupted.

E. Notwithstanding anything to the contrary set forth in this Agreement, if you enter into a maintenance agreement for Equipment, such maintenance agreement does not include a license for Base Software. If you do not have a license for Base Software for Equipment, you may enter into a separate license agreement with Xerox for such Base Software.

24. SOFTWARE SUPPORT. During the period that Xerox (or a designated servicer) provides Basic Services for the Equipment but in no event longer than five (5) years after Xerox stops taking orders from customers for their acquisition of the subject model of Equipment, Xerox (or a designated servicer) will also provide software support for the Base Software under the following terms. For Application Software licensed pursuant to this Agreement, Xerox will provide this same level of support provided you are current in the payment of all Initial License and Annual Renewal Fees (or, for programs not requiring Annual Renewal Fees, the payment of the Initial License Fee and the annual "Support Only" Fees):

A. In accordance with its agreement with you, Xerox will assure that Base and Application Software performs in material conformity with its user documentation and will maintain a toll-free hotline during standard business hours to answer related questions.

B. Xerox may make available new releases of the Base or Application Software that primarily incorporate coding error fixes and are designated as "Maintenance Releases". Maintenance Releases are provided at no charge and must be implemented within six (6) months after being made available to you. Each new Maintenance Release shall be considered Base or Application Software governed by these Software Terms. New releases of the Base or Applications Software that are not Maintenance Releases, if any, may be subject to additional license fees at Xerox's then-current pricing and shall be considered Base or Application Software governed by these Software Terms (unless other wise noted). Xerox will not be in breach of its software support obligations hereunder if, in order to implement, in whole or in part, a new release of Base or Application Software provided or made available to you by Xerox, you must procure, at your expense, additional hardware and/or software from Xerox or any other entity. You agree to return or destroy all prior releases.

C. Xerox will use reasonable efforts, either directly and/or with its vendors, to resolve coding errors or provide workarounds or patches, provided you report problems as specified by Xerox.

D. Xerox shall not be obligated (1) to support any Base or Application software that is two or more releases older than Xerox's most current release, or (2) to remedy coding errors if you have modified the Base or Application Software.

E. For Application Software, Xerox may annually increase the Annual Renewal and Support-Only Fees, each such increase not to exceed 10%. (For state and local-government customers, this adjustment shall take place at the commencement of each of your annual contract cycles.)

F. DIAGNOSTIC SOFTWARE. Software used to maintain the Equipment and/or diagnose its failures or substandard performance (collectively "Diagnostic Software") is embedded in, resides on, or may be loaded onto the Equipment. The Diagnostic Software and method of entry or access to it constitute valuable trade secrets of Xerox. Title to the Diagnostic Software shall at all times remain solely with Xerox and/or Xerox's licensors. You agree that (a) your acquisition of the Equipment does not grant you a license or right to use the Diagnostic Software in any manner, and (b) that unless separately licensed by Xerox to do so, you will not use, reproduce, distribute, or disclose the Diagnostic Software for any purpose (or allow third parties to do so). You agree at all times (including subsequent to the expiration of this Agreement) to allow Xerox to access, monitor, and otherwise take steps to prevent unauthorized use or reproduction of the Diagnostic Software.

**GOVERNMENTAL TERMS:** The following additional terms apply only to state and local government customers:

25. REPRESENTATIONS & WARRANTIES, FUNDING, TAX TREATMENT & PAYMENT.

A. REPRESENTATIONS & WARRANTIES. You hereby represent and warrant, as of the date of this Agreement, that: (1) you are a State or a fully constituted political subdivision or agency of the State in which you are located and are authorized to enter into, and carry out, your obligations under this Agreement and any other documents required to be delivered in connection with the Agreement (collectively, the "Documents"); (2) the Documents have been duly authorized, executed and delivered by you in accordance with all applicable laws, rules, ordinances and regulations (including, but not limited to, all applicable laws governing open meetings, public bidding and appropriations required in connection with this Agreement and the acquisition of the Equipment) and are valid, legal, binding agreements, enforceable in accordance with their terms and the person(s) signing the Documents have the authority to do so, are acting with the full authorization of your governing body and hold the offices indicated below their signatures, each of which are genuine; (3) the Equipment is essential to the immediate performance of a governmental or proprietary function by you within the scope of your authority and shall be used during the term hereof only by you and only to perform such function; and, (4) your obligations to remit payments under this Agreement constitute a current expense and not a debt under applicable state law and no provision of this Agreement constitutes a pledge of your tax or general revenues and any provision that is so construed by a court of competent jurisdiction is void from the inception of this Agreement.

B. FUNDING. You represent and warrant that all payments due and to become due during your current fiscal year are within the fiscal budget of such year and are included within an unrestricted and unencumbered appropriation currently available for the purchase/maintenance of the Equipment, and that it is your intent to use the Equipment for the entire term and to make all payments required under this Agreement. In the event that (1) through no action initiated by you your legislative body does not appropriate funds for the continuation of this Agreement for any fiscal year after the first fiscal year and has no funds to do so from other

sources and (2) you have secured a creditworthy assignee acceptable to Xerox in its sole discretion within your general organization who can continue this Agreement, this Agreement may be terminated. To effect this termination, you shall, thirty (30) days prior to the beginning of the fiscal year for which your legislative body does not appropriate funds for such upcoming fiscal year, send Xerox written notice stating that your legislative body failed to appropriate funds and that you have made the required effort to find an assignee. Your notice must be accompanied by payment of all sums then owed through the current year to Xerox under this Agreement and must certify that the canceled Equipment is not being replaced by equipment performing similar functions during the ensuing fiscal year. In addition, you agree at your expense to return the Equipment in good condition to a location designated by Xerox and that, when returned, the Equipment will be free of all liens and encumbrances. You will then be released from your obligations to make any further payments to Xerox beyond those due for the current fiscal year (with Xerox retaining all sums paid to date).

**C. TAX TREATMENT.** This Agreement has been accepted on the basis of your representation that Xerox may claim any interest paid by you as exempt from federal income tax under Section 103(c) of the Code. You agree to comply with the information reporting requirements of Section 149(e) of the Code. Such compliance shall include, but not be limited to, the execution of 8038-G or 8038-GC Information Returns. You hereby appoint Xerox as your agent to maintain, and Xerox agrees to maintain, or cause to be maintained, a complete and accurate record of all assignments of this Agreement in form sufficient to comply with the book entry requirements of Section 149(a) of the Code and the regulations prescribed thereunder from time to time. Should Xerox lose the benefit of this exemption as a result of your failure to comply with or be covered by Section 103(c) or its regulations, then, subject to the availability of funds and upon demand by Xerox, you shall pay Xerox an amount equal to its loss in this regard. At the time of execution of this Agreement, you shall provide Xerox with a properly prepared and executed copy of US Treasury Form 8038 or 8038-GC.

**D. PAYMENT.** Your payment is due within thirty (30) days of our invoice date.

**ADDITIONAL TERMS:** The following additional terms apply only to the extent that you have agreed to one or more of the options described below:

**26. PREPAID INVOICE.** If this option has been selected, you will not be required to pay your Installment Sale Payment during the initial number of months indicated.

**27. CONSUMABLE SUPPLIES INCLUDED IN BASE/PRINT CHARGES.** If this option has been selected, Xerox (or a designated servicer) will provide you with black toner (excluding highlight color toner), black developer, copy Cartridges, and, if applicable, fuser ("Consumable Supplies") throughout the term of this Agreement. For full-color Equipment, Consumable Supplies shall also include, as applicable, color toner and developer. You agree that the Consumable Supplies are Xerox's property until used by you, that you will use them only with the Equipment, that you will either (a) return all Cartridges to Xerox for remanufacturing once they have been run to their cease-function point (at Xerox's expense when using Xerox-supplied shipping labels), and that at the end of the term of this Agreement either (a) you will return any unused Consumable Supplies to Xerox (at Xerox's expense when using Xerox-supplied shipping labels) or (b) destroy them in a manner permitted by applicable law. Should your use of Consumable Supplies exceed Xerox's published yields for these items by more than 10%, you agree that Xerox shall have the right to charge you for any such excess usage. When requested by Xerox, you agree to provide meter readings and inventory of Consumable Supplies in your possession.

**28. REPLACEMENT/MODIFICATION OF PRIOR XEROX AGREEMENT.** If this option has been selected, this Agreement will replace or modify a prior agreement between you and Xerox covering the specified equipment. If it is a replacement agreement, the prior agreement shall be null and void. If it is a modification, the prior agreement shall remain in effect except that any terms presented in this modification agreement that conflict with, or are additive to, any prior agreement shall take precedence over the prior terms for the balance of the Agreement. In addition, modifications requiring a reamortization of installment sale payments may include a one-time administrative/processing charge which will appear on your first bill under this revised arrangement.

**29. XEROX AS FINANCIAL INTERMEDIARY.** If this option has been selected, you are purchasing on an installment basis specifically identified products that were selected by you and that are not sold by Xerox in the normal course of its business. If you have signed a purchase contract for such products, by signing this Agreement you assign your rights but none of your obligations under such purchase contract to Xerox. With regard to these products, you agree that Xerox is selling them to you "AS IS, WHERE IS" and that XEROX HAS NOT MADE, AND YOU HEREBY WAIVE, ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES WHATSOEVER, INCLUDING,

WITHOUT LIMITATION, (a) ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE OR NON-INFRINGEMENT, and (b) ANY REPRESENTATION OR WARRANTY REGARDING THE PRODUCTS' SUITABILITY, DESIGN, CONDITION, DURABILITY, OPERATION, QUALITY OF MATERIALS OR WORKMANSHIP, OR COMPLIANCE WITH SPECIFICATIONS OR APPLICABLE LAW. Xerox assigns to you, to the extent assignable, any warranty rights it has to these products (which rights shall revert to Xerox if you breach this Agreement). You agree (1) that these products are not covered by Xerox's obligation to provide Basic Services; (2) to maintain a service agreement for these products with a service provider acceptable to Xerox throughout this Agreement's term; (3) to pay all personal property taxes related to these products; and, (4) to assign to Xerox any rights you have to these products until title passes from Xerox to you (which, subject to any software licenses surrounding the acquisition of these products, shall occur when you obtain title to all Xerox-brand Equipment covered by this Agreement).

**30. FINANCED SOFTWARE TOTAL.** If this option has been selected, the initial license fees for any Application Software set forth in this Agreement shall be included in the amount financed on an installment basis and be paid for through your Installment Sale Payments. If you breach this license or any of your obligations regarding the Equipment, the full amount of the initial license fees shall be immediately due and payable.

**31. FINANCED SUPPLIES TOTAL.** If this option has been selected, the cost of any supplies you have purchased under this Agreement shall be included in the amount financed on an installment basis and shall be paid for through your Installment Sale Payments. If you breach any of your obligations regarding the Equipment, the full amount of the supply costs shall become immediately due and payable.

**32. REFINANCE OF PRIOR AGREEMENT.** If this option has been selected, the balance of your prior indicated agreement with Xerox or a third party shall be included in the amount financed on an installment basis and shall be paid for through your Installment Sale Payments. If your prior agreement is with a third party, you hereby acknowledge that you have the right to terminate the agreement and agree to provide a statement from the third party identifying the equipment at issue and the amount to be paid off (as well as a statement from you identifying the payee and mailing address for your payoff check). If your prior agreement was with Xerox, the use of this refinance option shall render your prior agreement null and void. If you breach this Agreement, the full amount of your prior agreement balance shall be immediately due and payable.

**33. ADJUSTMENT PERIOD.** If this option has been selected, the amount you pay Xerox to maintain the Equipment will be adjusted in accordance with the information contained in the Adjustment Period portion of this Agreement; as a result, your initial periodic maintenance payments shall be different from those payable during the balance of this Agreement.

**34. K-16 BILLING SUSPENSION.** If this option has been selected, your Minimum Periodic Base Charges and Print Charges will be suspended each year during the months indicated. During these months, you agree not to use the Equipment and that Xerox shall not be responsible for providing Basic Services on it. If Xerox provides Basic Services during the K-16 Billing Suspension period, you will be billed at Xerox's then-current Time and Materials ("T&M") rates for such Basic Services.

**35. TRADE-IN EQUIPMENT.** If this option has been selected, you are providing equipment to Xerox as part of this Agreement ("Trade-In Equipment") and the following shall apply:

**A. TITLE TRANSFER.** You warrant that you have the right to transfer title to the Trade-In Equipment and that it has been installed and performing its intended function. Title and risk of loss to the Trade-In Equipment shall pass to Xerox when Xerox removes it from your premises.

**B. CONDITION.** You warrant that the Trade-In Equipment is in good working order, has not been modified from its original configuration (other than by Xerox), and has a UL label attached. You agree to maintain the Trade-In Equipment at its present site and in substantially its present condition until removed by Xerox.

**C. ACCRUED CHARGES.** You agree to pay all accrued charges for the Trade-In Equipment (up to and including payment of the Final Principal Payment) Number and to pay all maintenance, administrative, supply, and finance charges for this equipment through the date title passes to Xerox.

**36. RUN LENGTH PLAN.** If this option has been selected, the first ten prints of each original (per run) are recorded and billed on both meters with all subsequent prints recorded and billed on Meter A only.

37. FIXED PRICE PLAN. If this option has been selected, Xerox will forego its right to increase the amount you pay Xerox to maintain the Equipment throughout the initial term of this Agreement.

38. PER-FOOT PRICING. If this option has been selected, all Print Charges will be billed on a per-foot basis, with each linear or square foot, as applicable, equal to one print.

39. ANNUAL CHARGE PLAN. If this option has been selected, the Base Charge for your maintenance plan will be billed annually in advance.

40. EXTENDED SERVICE HOURS. If this option has been selected, Xerox will provide Basic Services during the hours indicated, with the first number establishing the number of eight-hour shifts covered and the second establishing the days of the week (e.g., 2 x 6 would provide service from 8:00 A.M. to 11:59 P.M., Monday through Saturday). The cost of this enhanced service coverage will be billed separately and, as such, is not included in your Minimum Periodic Base Charge or Print Charges.

41. STANDARD MAINTENANCE AGREEMENT. If this option has been selected, Xerox will provide Basic Services for the Equipment subject to your payment of the indicated annual periodic base charge (which in all cases is nonrefundable) along with a standardized per-call charge established by Xerox (which is subject to adjustment by Xerox at its discretion).

42. ATTACHED ADDENDA. If this option has been selected, you acknowledge that one or more specified addenda (as indicated) have been provided to you. These addenda, which provide additional terms relevant to the transactions covered hereunder, are hereby fully integrated into this Agreement.

43. NEGOTIATED CONTRACT. If this option has been selected, the Products identified in this Agreement are subject solely to the terms contained in (a) either (1) the identified Negotiated Contract for the applicable sale and / or maintenance transaction or (2) if there are no such terms in the Negotiated Contract, the terms set forth in this Agreement, and, if applicable and notwithstanding anything to the contrary set forth in the Negotiated Contract, (b) the "Additional Terms" portion of this Agreement for the selected option or options to the extent the subject matter of any such selected option is not addressed in the Negotiated Contract.

44. DSA CONTRACT NUMBER. If a DSA Contract Number has been inserted, the Equipment and/or software identified in this Agreement are associated with the Services being provided under the referenced Document Services Agreement ("DSA"), but such Equipment and/or software are subject solely to the terms contained in this Agreement.

**For customer support tools to manage your account online, visit your Account Management link @ www.xerox.com**

# EXHIBIT D

# SALE / MAINTENANCE AGREEMENT

**XEROX**

Full Legal Name

| | |
|---|---|
| Customer Name (Bill to) | Universal Wilde |
| DBA/Name Overflow | |
| Street Address | 201 Summer Street |
| Box#/Routing | |
| City, State | Holliston, MA |
| Zip Code | - |
| Tax ID# | |

| | |
|---|---|
| Customer Name (Install) | Universal Wilde |
| DBA/Name Overflow (if req'd) | |
| Installed at Street Address | 201 Summer Street |
| Floor/Room/Routing | |
| City, State | Holliston, MA |
| Zip Code | - |
| County Installed In | |
| Customer Requested Install Date | |

**Check all that apply**
- ☐ Assoc./Coop. Name: _____
- ☐ Negotiated Contract #: _____  ☐ DSA Contract # -
- ☐ Attached Customer P.O. #s:  Supplies: _____
  - Sale/Install: _____  Maint.: _____
- ☐ State or Local Government Customer
- ☐ **Replacement/Modification of Prior Xerox Agreement**
  Agreement covering Xerox Equipment Serial# (or 95#):
  is hereby ☐ modified ☐ replaced  Effective Date: _____
  Comments: _____
- ☐ **Installment Sales Information** Install. Sale Term: _____ months
  Int. Rate: _%_  Total Int. Payable: $ _____
  - ☐ Prepaid Invoice: _____ months
  - ☐ Refin. of Prior Agrmt.: ☐ Xerox (95#): _____  ☐ 3rd Party Eq.
  - Amt Refin: $  Int Rate: %  Total Int Payable: $
- ☐ **Maintenance Information**  Maintenance Term : _____ months
  - ☐ Supplies included in Base/Print Charges

## Cash Sale/Installment Sale - Payment Information

| Product (with serial number, if in place equipment) | Qty | Prev Install | Fin'l Interm | Warr # mo | List Price (Total) | Down Payment | Total Discount (Inc. Trade-In) | Net Price (Total) |
|---|---|---|---|---|---|---|---|---|
| Igen 150 | | ☐ | ☐ | | $ | $ | $ | $ |
| XPD004557 | | ☐ | ☐ | | $ | $ | $ | $ |
| 332L698377 | | ☐ | ☐ | | $ | $ | $ | $ |
| | | ☐ | ☐ | | $ | $ | $ | $ |
| | | ☐ | ☐ | | $ | $ | $ | $ |

$ _____ : INSTALLMENT SALE PAYMENT (excl. of applic. taxes)

Payment Frequency ☐ Monthly ☐ Other: _____

Payment Mode ☐ Advance ☐ Arrears

## Maintenance Agreement Price Information   ☐ Adjustment Period (Maintenance Agreement Only)

| | | Period A - Mos. Affected: - | | Period B - Mos. Affected: - | |
|---|---|---|---|---|---|
| Periodic Base Charge | $ | Periodic Base Charge | $ | Periodic Base Charge | $ |
| Print Charge Meter 1: | | Print Charge Meter 1: | | Print Charge Meter 1: | |
| Prints 1 - | $ | Prints 1 - | $ | Prints 1 - | $ |
| Prints - | $ | Prints - | $ | Prints - | $ |
| Prints - | $ | Prints - | $ | Prints - | $ |
| Print Charge Meter 2 | | Print Charge Meter 2: | | Print Charge Meter 2: | |
| Prints 1 - | $ | Prints 1 - | $ | Prints 1 - | $ |
| Prints - | $ | Prints - | $ | Prints - | $ |
| Periodic Min.# of Prints (based on Meter 1 Print Charges) | | Periodic Min.# of Prints (based on Meter 1 Print Charges) | | Periodic Min.# of Prints (based on Meter 1 Print Charges) | |

☐ Purchased Supplies    ☐ Cash  ☐ Fin'd

| Reorder # | Qty | Description | Price |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | Total Price = | $ |

☐ Application Software

| Software Title | Initial License Fee | Annual Renewal Fee |
|---|---|---|
| | ☐ Cash ☐ Finance | ☐ Support Only |
| | $ | $ |
| | $ | $ |
| | $ | $ |
| Total Initial License Fees = | $ | |

☐ **Trade-In Allowance**

| Manufacturer | Model/ Serial # | Final Principal Payment #: | Allowance |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |
| | Total Allowance = | | $ |

Total Allowance Applied to: ☐ Trade-In Equip. Balance: $ _____
☐ Price of Replacement. Equip.: $ _____

☐ K-16 Billing
Suspension
(check 1 as required)
Months affected
- ☐ June only
- ☐ July only
- ☐ August only
- ☐ June - July
- ☐ July - August

**Additional Options** (check all that apply)
- ☐ Run Length Plan   ☐ Fixed Price Plan
- ☐ Per-Foot Pricing   ☐ Quarterly Bill Plan
- ☒ Extended Service Hours:
  Description:  3x7 / $ _____  1200 mo.
- ☐ Std. Maint. Agrmt.: $ _____ / year
- ☐ Attached Addenda: _____
- ☐ Other Addenda: _____

## Agreement Presented By:

Xerox Name: _____  Phone: _____

FOR AUTHORIZED HQ INTERNAL USE ONLY

Accepted _____  Xerox Corporation
By: _____
Title: _____  Date _____
Worksheet: _____  Unit _____

www.xerox.com

CUSTOMER ACKNOWLEDGES RECEIPT OF THE TERMS OF THIS AGREEMENT (CONSISTING OF 6 PAGES INCLUDING THIS FACE PAGE)

Auth. Signer Name: JEFF MCFADDEN  VP Manufacturing
(Please Print Name of Authorized Signer)

Signature: _____  Date: 10/1/14
(Signature of Authorized Signer)

Auth. Signer Title: _____  Phone: _____
E-Mail: _____

☒ Tax Exempt (*Must attach Sales Tax Exemption Certificate)

GENERAL TERMS:   The following terms apply to all sale and maintenance transactions:

1.  PRODUCTS.  The term "Products" shall refer collectively to all equipment (the "Equipment"), software, and supplies ordered under this Agreement.  You represent that the Products are being ordered for your own business use (rather than resale) and that they will not be used for personal, household or family purposes.

2.  NON-CANCELABLE AGREEMENT.  THIS AGREEMENT CANNOT BE CANCELED OR TERMINATED EXCEPT AS EXPRESSLY PROVIDED HEREIN.  YOUR OBLIGATION TO MAKE ALL PAYMENTS AND TO PAY ANY OTHER AMOUNTS DUE   OR TO BECOME DUE SHALL BE ABSOLUTE AND UNCONDITIONAL AND SHALL NOT BE SUBJECT TO ANY DELAY, REDUCTION, SET-OFF, DEFENSE, COUNTERCLAIM OR RECOUPMENT FOR ANY REASON WHATSOEVER, IRRESPECTIVE OF XEROX'S PERFORMANCE OF ITS OBLIGATIONS HEREUNDER.  ANY CLAIM AGAINST XEROX MAY BE ASSERTED IN A SEPARATE ACTION AND SOLELY AGAINST XEROX.

3.  PAYMENT, TAXES & CREDIT HISTORY.

A.  Invoices are payable upon receipt and you agree to pay Xerox each Net Price amount or Installment Sale Payment (as applicable), each Minimum Periodic Base Charge, all Print Charges and all other sums due as follows:  (i)  if the invoice displays a due date, payment is due and must be received by Xerox on or before said due date, or (ii) if the invoice does not display a due date, payment is due and must be received by Xerox no later than thirty (30) days after the invoice date. .  Restrictive covenants on instruments or documents submitted for or with payments you send to Xerox will not reduce your obligations.

B.  You shall be responsible for any and all applicable Taxes, which will be included in Xerox's invoice unless you provide proof of your tax exempt status.  "Taxes" shall mean any tax, assessment or charge imposed or collected by any governmental entity or any political subdivision thereof, however designated or levied, imposed on this Agreement or the amounts payable to Xerox by you for the billing of Products, Print Charges, services and maintenance of any kind; Taxes include, but are not limited to, sales and use, rental, excise, gross receipts and occupational or privilege taxes, plus any interest and/or penalty thereon, but excluding any taxes on Xerox's net income.  If a taxing authority determines that Xerox did not collect all applicable Taxes, you shall remain liable to Xerox for such additional Taxes.

C.  You, to the extent required by applicable law, authorize Xerox (or its agent) to obtain credit reports, make such other credit inquiries as Xerox may deem necessary at any time, furnish payment history information to credit reporting agencies, and release to prospective assignees of this Agreement or any rights hereunder  credit-related information Xerox has about you and this Agreement.  Even if Products have been delivered, Xerox may, within sixty (60) days following its acceptance of this Agreement, revoke the Agreement if your credit approval is denied.

4.  BASIC SERVICES.   Xerox (or a designated servicer) will provide the following Basic Services under an express warranty or maintenance agreement (unless you are acquiring Equipment for which Xerox does not offer Basic Services; such Equipment to be designated as "No Svc."):

A.  REPAIRS & PARTS.  Xerox will make repairs and adjustments necessary to keep Equipment in good working order (including such repairs or adjustments required during initial installation).  Parts required for repair may be new, reprocessed, or recovered.

B.  HOURS & EXCLUSIONS.  Unless otherwise stated, Basic Services will be provided during Xerox's standard working hours (excluding Xerox-recognized holidays) in areas within the United States, its territories, and possessions open for repair service for the Equipment at issue.  You agree to give Xerox reasonable access to the Equipment.  Basic Services shall cover repairs and adjustments required as a result of normal wear and tear or defects in materials or workmanship (and shall exclude repairs or adjustments Xerox determines to relate to or be affected by the use of options, accessories, or other connected products not serviced by Xerox, as well as any non-Xerox alterations, relocation, service, supplies, or consumables).  You agree to use Equipment in accordance with, and to perform all operator maintenance procedures for Equipment as set forth in, the applicable manuals provided by Xerox.

C.  INSTALLATION SITE & METER READINGS.  The Equipment installation site must conform to Xerox's published requirements throughout the term of this Agreement.  If applicable, you agree to provide meter readings in the manner prescribed by Xerox.  If you do not provide Xerox with meter readings as required, Xerox may estimate them and bill you accordingly.

D.  EQUIPMENT REPLACEMENT.   If Xerox is unable to maintain the Equipment, your exclusive remedy for Xerox's failure to provide Basic Services, replace the Equipment with an identical product or, at Xerox's option, another product of equal or greater capabilities.  If a replacement product is provided pursuant to this Section, there will not be an additional charge for the replacement product and, except as set forth in the Section of this Agreement titled "PRICING INCREASES FOR MULTI-YEAR AGREEMENTS" , there will not be an additional charge for Basic Services during the then-current term during which Basic Services are being provided.

E.  CARTRIDGE PRODUCTS.   If Xerox is providing Basic Services for Equipment utilizing cartridges designated by Xerox as customer replaceable units, including copy/print cartridges and xerographic modules or fuser modules ("Cartridges")), and unless you have entered into a Standard Maintenance Agreement as described below, you agree to use only unmodified Cartridges purchased directly from Xerox or its authorized resellers in the United States and the failure to use such Cartridges shall void any warranty applicable to such Equipment.

F.  PC/WORKSTATION REQUIREMENTS.  In order to receive Basic Services and/or Software Support for equipment requiring connection to a PC or workstation, you must utilize a PC or workstation that either (1) has been provided by Xerox or (2) meets Xerox's published specifications.

G.  DELIVERY AND REMOVAL.  Xerox will be responsible for all standard delivery and removal charges.  You will be responsible for any non-standard delivery or removal charges incurred.

5.  WARRANTY DISCLAIMER & WAIVERS.  XEROX DISCLAIMS, AND YOU  WAIVE, THE IMPLIED WARRANTIES OF NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE.

6.  INTELLECTUAL PROPERTY INDEMNITY.  Xerox, at its expense, will defend you from, and pay any settlement agreed to by Xerox or any final judgment for, any claim that a Xerox-brand Product infringes a third party's U.S. intellectual property rights provided you promptly notify Xerox of the alleged infringement and permit Xerox to direct the defense.  Xerox is not responsible for any non-Xerox litigation expenses or settlements unless it preapproves them in writing.  To avoid infringement, Xerox may modify or substitute an equivalent Xerox-brand Product, refund the price paid for the Xerox-brand Product (less the reasonable rental value for the period it was available to you), or obtain any necessary licenses.  Xerox is not liable for any infringement-related liabilities outside the scope of this Section including, but not limited to, infringement based upon a Xerox-brand Product being modified to your specifications or being used or sold with products not provided by Xerox.

7.  LIMITATION OF LIABILITY.  Xerox shall not be liable to you for any direct damages in excess of $10,000 or the amounts paid hereunder, whichever is greater, and neither party shall be liable to the other for any special, indirect, incidental, consequential or punitive damages arising out of or relating to this Agreement, whether the claim alleges tortious conduct (including negligence) or any other legal theory.  The above-stated limitation of liability shall not be applicable to any specific indemnification obligations set forth in this Agreement.  Any action you take against Xerox must be commenced within two (2) years after the event that caused it.

8.  ASSIGNMENT.

A.  If you wish to assign any rights or obligations under this Agreement, you shall provide a written notice to Xerox of such request for consent, with said notice including the name of the proposed assignee.  Your request to assign this Agreement will be granted by Xerox if: (1) you are not in default under this Agreement or any other agreement with Xerox; (2) the proposed assignee agrees to the Section of this Agreement titled "PAYMENT, TAXES & CREDIT HISTORY" as applicable to it, for the purposes of the proposed assignment; (3) the proposed assignee meets Xerox's then current credit criteria for similar transactions as determined by Xerox in its sole discretion; and, (4) you and the proposed assignee execute a writing, in a form acceptable to Xerox, confirming said assignment.  Assignment by you requires the written consent of Xerox and may not be accomplished by operation of law.

B.  Xerox may assign this Agreement, in whole or in part, to a parent, subsidiary or affiliate of Xerox, or to a person or entity for the purposes of securitizing a pool of assets or as part of a third party financial transaction without prior notice to you; provided, however, any proposed assignment to a person or entity not identified previously in this sentence shall require your prior written consent.  In the event of an assignment permitted by the preceding sentence, Xerox, without notice to you, may release information it has about you related to this Agreement.  Each successive assignee of Xerox shall have all of the rights but none of the obligations of Xerox hereunder.   You shall continue to look to Xerox for performance of Xerox's obligations, including the provision of Basic Services,

relating to or arising from the performance of Xerox's obligations hereunder, you shall not assert any defense, setoff, claim or counterclaim that you may have or claim against Xerox against any assignee of Xerox. In the event of an assignment by Xerox, you shall remit payments due in accordance with remittance instructions of the assignee.

9. DEFAULT & REMEDIES; LATE CHARGES & COLLECTION COSTS.

A. For any payment not received by Xerox within ten (10) days of the due date as set forth herein, Xerox may charge, and you agree to pay, a late charge equal to the higher of five percent (5%) of the amount due or $25 (not to exceed the maximum amount permitted by law) as reasonable collection costs.

B. You will be in default under this Agreement if (1) Xerox does not receive any payment within fifteen (15) days after the date it is due or (2) if you breach any other obligation hereunder. If you default, Xerox, in addition to its other remedies (including the cessation of Basic Services), may require immediate payment, as liquidated damages for loss of bargain and not as a penalty, of (a) all amounts then due, plus interest on all amounts due from the due date until paid at the rate of one and one-half percent (1.5%) per month (not to exceed the maximum amount permitted by law); (b) the remaining Installment Sale Payments in the Agreement's term less any unearned finance charges (as reflected on Xerox's books and records) if the Equipment is being purchased on an installment basis; (c) the lesser of the remaining Minimum Periodic Base Charge in the Agreement's term or six (6) such payments for one-year agreements (and twelve (12) such payments for multi-year agreements) if this Agreement includes maintenance; and, (d) all applicable Taxes. Xerox's decision to waive or forgive a particular default shall not prevent Xerox from declaring any other default. In addition, if you default under this Agreement, you agree to pay all of the costs Xerox incurs to enforce its rights against you, including reasonable attorneys' fees and actual costs.

10. REPRESENTATIONS, WARRANTIES & COVENANTS. Each party represents that, as of the date of this Agreement, it has the lawful power and authority to enter into this Agreement, the individuals signing this Agreement are duly authorized to do so on its behalf and, by entering this Agreement, it will not violate any law or other agreement to which it is a party. You are not aware of anything that will have a material negative effect on your ability to satisfy your payment obligations under this Agreement and all financial information you have provided, or will provide, to Xerox is true and accurate and provides a good representation of your financial condition. Each party agrees that it will promptly notify the other party in writing of a change in ownership, if it relocates its principal place of business or changes the name of its business.

11. NOTICES. Notices must be in writing and will be deemed given five (5) days after mailing, or two (2) days after sending by nationally recognized overnight courier, to the other party's business address, or to such other address designated by either party to the other by written notice given pursuant to this sentence. The term "business address" shall mean, for you, the "Bill to" address listed on the first page of this Agreement and, for Xerox, our inquiry address set forth on the most recent invoice to you.

12. FORCE MAJEURE. Xerox shall not be liable to you during any period in which its performance is delayed or prevented, in whole or in part, by a circumstance beyond its reasonable control, which circumstances include, but are not limited to, the following: act of God (e.g., flood, earthquake, wind); fire; war; act of a public enemy or terrorist; act of sabotage; strike or other labor dispute; riot; misadventure of the sea; inability to secure materials and / or transportation; or, a restriction imposed by legislation, an order or a rule or regulation of a governmental entity. If such a circumstance occurs, Xerox shall undertake reasonable action to notify you of the same.

13. MISCELLANEOUS. This Agreement shall be construed under the laws of the State of New York (without regard to conflict-of-law principles). You agree to the jurisdiction and venue of the federal and state courts in Monroe County, New York. In any action to enforce this Agreement, the parties agree to waive their right to a jury trial. If a court finds any term of this Agreement to be unenforceable, the remaining terms of this Agreement shall remain in effect Both parties may retain a reproduction (e.g., electronic image, photocopy, facsimile) of this Agreement which shall be admissible in any action to enforce it, but only the Agreement held by Xerox shall be considered an original. Xerox may accept this Agreement either by its authorized signature or by commencing performance (e.g., Equipment delivery, initiating Basic Services, entering the Maintenance Agreement into billing systems, etc.). All changes to this Agreement must be made in a writing signed by both parties; accordingly, any terms on your ordering documents shall be of no force or effect. The following four sentences control over every other part of this Agreement and over all other documents now or later pertaining to this Agreement. We both intend to comply with applicable laws. In no event will Xerox charge or collect any amounts in excess of those allowed by applicable law. Any part of this Agreement that would, but for this Section, be read under any circumstances to allow for a charge higher than that allowed under

any applicable legal limit, is limited and modified by this Section to limit the amount charged or collected to the amount of the greatest charge or amount allowed under the legal limit. If, in any circumstances, any amount in excess of that allowed by law is charged or received, any such charge will be deemed limited by the amount legally allowed and any amount received by Xerox in excess of that legally allowed will be applied by us to the payment of amounts legally owed under this Agreement, or refunded to you.

SALE TERMS: The following additional terms apply only to sale transactions:

14. COMMENCEMENT, TITLE, RISK, AND RELOCATION.

A. The term for this Agreement and any warranty applicable to the Equipment shall commence upon installation of the Equipment; provided, however, for customer-installable Equipment, the term for this Agreement and any express warranty period applicable to the Equipment shall commence upon equipment delivery date.

B. Title and risk of loss to Equipment will pass to you upon shipment from a Xerox controlled facility. Upon passage to you of title to the Equipment, you must comply with all applicable laws and regulations regarding the export of any commodity, technology and/or software. Until you have paid for the Equipment in full, you agree that: (1) it shall remain personal property; (2) you will not attach any of it as a fixture to any real estate; (3) you will not pledge, sub-lease or part with possession of it or file or permit to be filed any lien against it; and, (4) you will not make any permanent alterations to it.

C. Until you have paid for the Equipment in full, you must provide Xerox prior written notice of all Equipment relocations and, upon your request, Xerox may arrange to relocate the Equipment at your expense. While Equipment is being relocated, you are responsible for all payments required under this Agreement to Xerox. All parts/materials replaced, including as part of an upgrade, will become Xerox's property.

15. CARTRIDGES. Cartridges packed with Equipment and replacement Cartridges may be new, remanufactured or reprocessed. Remanufactured and reprocessed Cartridges meet Xerox's new Cartridge performance standards and contain new and/or reprocessed components. To enhance print quality, the Cartridge(s) for many models of Equipment have been designed to cease functioning at a predetermined point. In addition, many Equipment models are designed to function only with Cartridges that are newly manufactured original Xerox Cartridges or with Cartridges intended for use in the U.S. Equipment configuration which permits use of non-newly manufactured original Xerox Cartridges may be available from Xerox at an additional charge. Cartridges sold as Environmental Partnership ("EP") Cartridges remain the property of Xerox. You agree that you shall return all EP Cartridges and may return other Cartridges to Xerox, at Xerox's expense when using Xerox-supplied shipping labels, for remanufacturing once such Cartridges cease functioning.

16. EQUIPMENT STATUS. Unless you are acquiring Previously Installed Equipment, Equipment will be either (a) "Newly Manufactured," which may contain some recycled components that are reconditioned; (b) "Factory Produced New Model", which is manufactured and newly serialized at a Xerox factory, adds functions and features to a product previously disassembled to a Xerox predetermined standard, and contains both new components and recycled components that are reconditioned; or (c) "Remanufactured", which has been factory produced following disassembly to a Xerox predetermined standard and contains both new components and recycled components that are reconditioned.

17. PREPAYMENT OF EQUIPMENT PURCHASED ON INSTALLMENT BASIS. You may prepay your remaining principal balance on Equipment purchased on an installment basis at any time, thereby eliminating your obligation to pay future finance charges.

18. PROTECTION OF XEROX'S RIGHTS. Until you have paid for the Equipment in full, Xerox shall have a purchase money security interest in it and you hereby authorize Xerox or its agents to file, by any permissible means, financing statements necessary to protect its rights in the Equipment. Xerox may take on your behalf and at your expense any action required to be taken by you under this Agreement and which you fail to take.

MAINTENANCE TERMS: The following additional terms apply only to maintenance transactions:

19. PRICING INCREASES FOR MULTI-YEAR AGREEMENTS. Xerox may annually increase the Minimum Periodic Maintenance Payment and Print Charges established under your multi-year maintenance agreement, each such increase not to exceed 10%. (For state and local government customers, this adjustment shall take place at the commencement of each of your annual contract cycles.)

21. MINIMUM MAINTENANCE PAYMENTS. Each Minimum Maintenance Payment includes a Periodic Base Charge, and may include a Periodic Minimum Number of Prints. Minimum Maintenance Payments are billed in advance, with additional Print Charges billed in arrears.

22. RENEWAL. Unless either party provides notice at least thirty (30) days before the end of the term of its intention not to renew this Agreement, it will renew automatically for successive terms of the same number of months, terms and conditions and billing frequency as the original Agreement. Pricing for this renewal term shall be at Xerox's then-current published pricing.

**SOFTWARE TERMS:** The following additional terms apply only to transactions covering Application Software and/or Xerox-brand Equipment:

23. SOFTWARE LICENSE. The following terms apply to copyrighted software and the accompanying documentation, including, but not limited to, operating system software, provided with or within the Xerox-brand Equipment acquired hereunder ("Base Software") as well as software specifically set out as "Application Software" on the face of this Agreement. This license does not apply to any Diagnostic Software nor to any software / documentation accompanied by a clickwrap or shrinkwrap license agreement or otherwise made subject to a separate license agreement.

A. Xerox grants you a non-exclusive, non-transferable license to use the Base Software within the United States, its territories, and possessions (the "United States") only on or with the Equipment with which (or within which) it was delivered. For Application Software, Xerox grants you a non-exclusive, non-transferable license to use this software within the United States on any single unit of equipment for as long as you are current in the payment of any indicated software license fees (including any Annual Renewal Fees). You have no other rights to the Base or Application Software and, in particular, may not: (1) distribute, copy, modify, create derivatives of, decompile, or reverse engineer this software; (2) activate any software delivered with or within the Equipment in an unactivated state; or, (3) allow others to engage in same. Title to the Base and Application Software and all copyrights and other intellectual property rights in it shall at all times reside solely with Xerox and/or its licensors (who shall be considered third-party beneficiaries of this Agreement's software and limitation of liability provisions). Base and Application Software may contain, or be modified to contain, computer code capable of automatically disabling proper operation or functioning of the Equipment. Such disabling code may be activated if: (i) Xerox is denied reasonable access to the Base or Application Software to periodically reset such code; (ii) you are notified of a default under any term of this Agreement; or, (iii) your license is terminated or expires.

B. Xerox may terminate your license for any Base Software (1) immediately if you no longer use or possess the Equipment or are a lessor of the Equipment and your first lessee no longer uses or possesses it, or (2) upon the termination of any agreement under which you have rented or leased the Equipment.

C. If you transfer possession of the Equipment, Xerox will offer the transferee a license to use the Base Software within the United States on or with it, subject to Xerox's then-applicable terms and license fees, if any, and provided the transfer is not in violation of Xerox's rights.

D. Xerox warrants that the Base and Application Software will perform in material conformity with its user documentation for a ninety (90) day period from the date it is delivered or, for software installed by Xerox, the date of software installation. Neither Xerox nor its licensors warrant that the Base or Application Software will be free from errors or that its operation will be uninterrupted.

E. Notwithstanding anything to the contrary set forth in this Agreement, if you enter into a maintenance agreement for Equipment, such maintenance agreement does not include a license for Base Software. If you do not have a license for Base Software for Equipment, you may enter into a separate license agreement with Xerox for such Base Software.

24. SOFTWARE SUPPORT. During the period that Xerox (or a designated servicer) provides Basic Services for the Equipment but in no event longer than five (5) years after Xerox stops taking orders from customers for their acquisition of the subject model of Equipment, Xerox (or a designated servicer) will also provide software support for the Base Software under the following terms. For Application Software licensed pursuant to this Agreement, Xerox will provide this same level of support provided you are current in the payment of all Initial License and Annual Renewal Fees (or, for programs not requiring Annual Renewal Fees, the payment of the Initial License Fee and the annual "Support Only" Fees):

A. Xerox will assure that Base and Application Software performs in material conformity to its documentation and will provide support via a toll-free hotline during standard business hours to answer related questions.

B. Xerox may make available new releases of the Base or Application Software that primarily incorporate coding error fixes and are designated as "Maintenance Releases". Maintenance Releases are provided at no charge and must be implemented within six (6) months after being made available to you. Each new Maintenance Release shall be considered Base or Application Software governed by these Software Terms. New releases of the Base or Applications Software that are not Maintenance Releases, if any, may be subject to additional license fees at Xerox's then-current pricing and shall be considered Base or Application Software governed by these Software Terms (unless other wise noted). Xerox will not be in breach of its software support obligations hereunder if, in order to implement, in whole or in part, a new release of Base or Application Software provided or made available to you by Xerox, you must procure, at your expense, additional hardware and/or software from Xerox or any other entity. You agree to return or destroy all prior releases.

C. Xerox will use reasonable efforts, either directly and/or with its vendors, to resolve coding errors or provide workarounds or patches, provided you report problems as specified by Xerox.

D. Xerox shall not be obligated to (1) support any Base or Application software that is two or more releases older than Xerox's most current release, or (2) to remedy coding errors if you have modified the Base or Application Software.

E. For Application Software, Xerox may annually increase the Annual Renewal and Support-Only Fees, each such increase not to exceed 10%. (For state and local-government customers, this adjustment shall take place at the commencement of each of your annual contract cycles.)

F. DIAGNOSTIC SOFTWARE. Software used to maintain the Equipment and/or diagnose its failures or substandard performance (collectively "Diagnostic Software") is embedded in, resides on, or may be loaded onto the Equipment. The Diagnostic Software and method of entry or access to it constitute valuable trade secrets of Xerox. Title to the Diagnostic Software shall at all times remain solely with Xerox and/or Xerox's licensors. You agree that (a) your acquisition of the Equipment does not grant you a license or right to use the Diagnostic Software in any manner, and (b) that unless separately licensed by Xerox to do so, you will not use, reproduce, distribute, or disclose the Diagnostic Software for any purpose (or allow third parties to do so). You agree at all times (including subsequent to the expiration of this Agreement) to allow Xerox to access, monitor, and otherwise take steps to prevent unauthorized use or reproduction of the Diagnostic Software.

**GOVERNMENTAL TERMS:** The following additional terms apply only to state and local government customers:

25. REPRESENTATIONS & WARRANTIES, FUNDING, TAX TREATMENT & PAYMENT.

A. REPRESENTATIONS & WARRANTIES. You hereby represent and warrant, as of the date of this Agreement, that: (1) you are a State or a fully constituted political subdivision or agency of the State in which you are located and are authorized to enter into, and carry out, your obligations under this Agreement and any other documents required to be delivered in connection with the Agreement (collectively, the "Documents"); (2) the Documents have been duly authorized, executed and delivered by you in accordance with all applicable laws, rules, ordinances and regulations (including, but not limited to, all applicable laws governing open meetings, public bidding and appropriations required in connection with this Agreement and the acquisition of the Equipment) and are valid, legal, binding agreements, enforceable in accordance with their terms and the person(s) signing the Documents have the authority to do so, are acting with the full authorization of your governing body and hold the offices indicated below their signatures, each of which are genuine; (3) the Equipment is essential to the immediate performance of a governmental or proprietary function by you within the scope of your authority and shall be used during the term hereof only by you and only to perform such function; and, (4) your obligations to remit payments under this Agreement constitute a current expense and not a debt under applicable state law and no provision of this Agreement constitutes a pledge of your tax or general revenues and any provision that is so construed by a court of competent jurisdiction is void from the inception of this Agreement.

B. FUNDING. You represent and warrant that all payments due and to become due during your current fiscal year are within the fiscal budget of such year and are included within an unrestricted and unencumbered appropriation currently available for the purchase/maintenance of the Equipment, and that it is your intent to use the Equipment for the entire term and to make all payments required under this Agreement. In the event that (1) through no action initiated by you your legislative body does not appropriate funds for the continuation of this Agreement for any fiscal year after the first fiscal year and has no funds to do so from other

Xerox Form# 51858t&c (05/2005)

creditworthy assignee acceptable to Xerox with a financial and general organization who can continue this Agreement, this Agreement may be terminated. To effect this termination, you shall, thirty (30) days prior to the beginning of the fiscal year for which your legislative body does not appropriate funds for such upcoming fiscal year, send Xerox written notice stating that your legislative body failed to appropriate funds and that you have made the required effort to find an assignee. Your notice must be accompanied by payment of all sums then owed through the current year to Xerox under this Agreement and must certify that the canceled Equipment is not being replaced by equipment performing similar functions during the ensuing fiscal year. In addition, you agree at your expense to return the Equipment in good condition to a location designated by Xerox and that, when returned, the Equipment will be free of all liens and encumbrances. You will then be released from your obligations to make any further payments to Xerox beyond those due for the current fiscal year (with Xerox retaining all sums paid to date).

**C. TAX TREATMENT.** This Agreement has been accepted on the basis of your representation that Xerox may claim any interest paid by you as exempt from federal income tax under Section 103(c) of the Code. You agree to comply with the information reporting requirements of Section 149(e) of the Code. Such compliance shall include, but not be limited to, the execution of 8038-G or 8038-GC Information Returns. You hereby appoint Xerox as your agent to maintain, and Xerox agrees to maintain, or cause to be maintained, a complete and accurate record of all assignments of this Agreement in form sufficient to comply with the book entry requirements of Section 149(a) of the Code and the regulations prescribed thereunder from time to time. Should Xerox lose the benefit of this exemption as a result of your failure to comply with or be covered by Section 103(c) or its regulations, then, subject to the availability of funds and upon demand by Xerox, you shall pay Xerox an amount equal to its loss in this regard. At the time of execution of this Agreement, you shall provide Xerox with a properly prepared and executed copy of US Treasury Form 8038 or 8038-GC.

**D. PAYMENT.** Your payment is due within thirty (30) days of our invoice date.

**ADDITIONAL TERMS:** The following additional terms apply only to the extent that you have agreed to one or more of the options described below:

**26. PREPAID INVOICE.** If this option has been selected, you will not be required to pay your Installment Sale Payment during the initial number of months indicated.

**27. CONSUMABLE SUPPLIES INCLUDED IN BASE/PRINT CHARGES.** If this option has been selected, Xerox (or a designated servicer) will provide you with black toner (excluding highlight color toner), black developer, copy Cartridges, and, if applicable, fuser ("Consumable Supplies") throughout the term of this Agreement. For full-color Equipment, Consumable Supplies shall also include, as applicable, color toner and developer. You agree that the Consumable Supplies are Xerox's property until used by you, that you will use them only with the Equipment, that you will either (a) return all Cartridges to Xerox for remanufacturing once they have been run to their cease-function point (at Xerox's expense when using Xerox-supplied shipping labels), and that at the end of the term of this Agreement either (a) you will return any unused Consumable Supplies to Xerox (at Xerox's expense when using Xerox-supplied shipping labels) or (b) destroy them in a manner permitted by applicable law. Should your use of Consumable Supplies exceed Xerox's published yields for these items by more than 10%, you agree that Xerox shall have the right to charge you for any such excess usage. When requested by Xerox, you agree to provide meter readings and inventory of Consumable Supplies in your possession.

**28. REPLACEMENT/MODIFICATION OF PRIOR XEROX AGREEMENT.** If this option has been selected, this Agreement will replace or modify a prior agreement between you and Xerox covering the specified equipment. If it is a replacement agreement, the prior agreement shall be null and void. If it is a modification, the prior agreement shall remain in effect except that any terms presented in this modification agreement that conflict with, or are additive to, any prior agreement shall take precedence over the prior terms for the balance of the Agreement. In addition, modifications requiring a reamortization of installment sale payments may include a one-time administrative/processing charge which will appear on your first bill under this revised arrangement.

**29. XEROX AS FINANCIAL INTERMEDIARY.** If this option has been selected, you are purchasing on an installment basis specifically identified products that were selected by you and that are not sold by Xerox in the normal course of its business. If you have signed a purchase contract for such products, by signing this Agreement you assign your rights but none of your obligations under such purchase contract to Xerox. With regard to these products, you agree that Xerox is selling them to you "AS IS, WHERE IS" and that XEROX HAS NOT MADE, AND YOU HEREBY WAIVE, ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES WHATSOEVER, INCLUDING,

WITHOUT LIMITATION, (a) ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, and (b) ANY REPRESENTATION OR WARRANTY REGARDING THE PRODUCTS' SUITABILITY, DESIGN, CONDITION, DURABILITY, OPERATION, QUALITY OF MATERIALS OR WORKMANSHIP, OR COMPLIANCE WITH SPECIFICATIONS OR APPLICABLE LAW. Xerox assigns to you, to the extent assignable, any warranty rights it has to these products (which rights shall revert to Xerox if you breach this Agreement). You agree (1) that these products are not covered by Xerox's obligation to provide Basic Services; (2) to maintain a service agreement for these products with a service provider acceptable to Xerox throughout this Agreement's term; (3) to pay all personal property taxes related to these products; and, (4) to assign to Xerox any rights you have to these products until title passes from Xerox to you (which, subject to any software licenses surrounding the acquisition of these products, shall occur when you obtain title to all Xerox-brand Equipment covered by this Agreement).

**30. FINANCED SOFTWARE TOTAL.** If this option has been selected, the initial license fees for any Application Software set forth in this Agreement shall be included in the amount financed on an installment basis and be paid for through your Installment Sale Payments. If you breach this license or any of your obligations regarding the Equipment, the full amount of the initial license fees shall be immediately due and payable.

**31. FINANCED SUPPLIES TOTAL.** If this option has been selected, the cost of any supplies you have purchased under this Agreement shall be included in the amount financed on an installment basis and shall be paid for through your Installment Sale Payments. If you breach any of your obligations regarding the Equipment, the full amount of the supply costs shall become immediately due and payable.

**32. REFINANCE OF PRIOR AGREEMENT.** If this option has been selected, the balance of your indicated agreement with Xerox or a third party shall be included in the amount financed on an installment basis and shall be paid for through your Installment Sale Payments. If your prior agreement is with a third party, you hereby acknowledge that you have the right to terminate the agreement and agree to provide a statement from the third party identifying the equipment at issue and the amount to be paid off (as well as a statement from you identifying the payee and mailing address for your payoff check). If your prior agreement was with Xerox, the use of this refinance option shall render your prior agreement null and void. If you breach this Agreement, the full amount of your prior agreement balance shall be immediately due and payable.

**33. ADJUSTMENT PERIOD.** If this option has been selected, the amount you pay Xerox to maintain the Equipment will be adjusted in accordance with the information contained in the Adjustment Period portion of this Agreement; as a result, your initial periodic maintenance payments shall be different from those payable during the balance of this Agreement.

**34. K-16 BILLING SUSPENSION.** If this option has been selected, your Minimum Periodic Base Charges and Print Charges will be suspended each year during the months indicated. During these months, you agree not to use the Equipment and that Xerox shall not be responsible for providing Basic Services on it. If Xerox provides Basic Services during the K-16 Billing Suspension period, you will be billed at Xerox's then-current Time and Materials ("T&M") rates for such Basic Services.

**35. TRADE-IN EQUIPMENT.** If this option has been selected, you are providing equipment to Xerox as part of this Agreement ("Trade-In Equipment") and the following shall apply:

**A. TITLE TRANSFER.** You warrant that you have the right to transfer title to the Trade-In Equipment and that it has been installed and performing its intended function. Title and risk of loss to the Trade-In Equipment shall pass to Xerox when Xerox removes it from your premises.

**B. CONDITION.** You warrant that the Trade-In Equipment is in good working order, has not been modified from its original configuration (other than by Xerox), and has a UL label attached. You agree to maintain the Trade-In Equipment at its present site and in substantially its present condition until removed by Xerox.

**C. ACCRUED CHARGES.** You agree to pay all accrued charges for the Trade-In Equipment (up to and including payment of the Final Principal Payment) Number and to pay all maintenance, administrative, supply, and finance charges for this equipment through the date title passes to Xerox.

**36. RUN LENGTH PLAN.** If this option has been selected, the first ten prints of each original (per run) are recorded and billed on both meters with all subsequent prints recorded and billed on Meter A only.

right to increase the amount you pay Xerox to maintain the Equipment during the initial term of this Agreement.

**38. PER-FOOT PRICING.** If this option has been selected, all Print Charges will be billed on a per-foot basis, with each linear or square foot, as applicable, equal to one print.

**39. ANNUAL CHARGE PLAN.** If this option has been selected, the Base Charge for your maintenance plan will be billed annually in advance.

**40. EXTENDED SERVICE HOURS.** If this option has been selected, Xerox will provide Basic Services during the hours indicated, with the first number establishing the number of eight-hour shifts covered and the second establishing the days of the week (e.g., 2 x 6 would provide service from 8:00 A.M. to 11:59 P.M., Monday through Saturday). The cost of this enhanced service coverage will be billed separately and, as such, is not included in your Minimum Periodic Base Charge or Print Charges.

**41. STANDARD MAINTENANCE AGREEMENT.** If this option has been selected, Xerox will provide Basic Services for the Equipment subject to your payment of the indicated annual periodic base charge (which in all cases is nonrefundable) along with a standardized per-call charge established by Xerox (which is subject to adjustment by Xerox at its discretion).

**42. ATTACHED ADDENDA.** If this option has been selected, you acknowledge that one or more specified addenda (as indicated) have been provided to you. These addenda, which provide additional terms relevant to the transactions covered hereunder, are hereby fully integrated into this Agreement.

**43. NEGOTIATED CONTRACT.** If this option has been selected, the Products identified in this Agreement are subject solely to the terms contained in (a) either (1) the identified Negotiated Contract for the applicable sale and / or maintenance transaction or (2) if there are no such terms in the Negotiated Contract, the terms set forth in this Agreement, and, if applicable and notwithstanding anything to the contrary set forth in the Negotiated Contract, (b) the "Additional Terms" portion of this Agreement for the selected option or options to the extent the subject matter of any such selected option is not addressed in the Negotiated Contract.

**44. DSA CONTRACT NUMBER.** If a DSA Contract Number has been inserted, the Equipment and/or software identified in this Agreement are associated with the Services being provided under the referenced Document Services Agreement ("DSA"), but such Equipment and/or software are subject solely to the terms contained in this Agreement.

**For customer support tools to manage your account online, visit your Account Management link @ www.xerox.com**

# EXHIBIT E

## ACCOUNT MODIFICATION AGREEMENT

This **ACCOUNT MODIFICATION AGREEMENT** (the "*Modification*") is entered into as of July 13, 2016, by and between **Xerox Corporation** ("*Xerox*"), whose address is 1303 Ridgeview Drive, Building 300, Mail Stop R382-450, Lewisville, Texas 75057 and **Universal Wilde, Inc.**, a Massachusetts corporation ("*Debtor*"), whose address is 26 Dartmouth Street, Westwood, Massachusetts 02090.

### PRELIMINARY STATEMENT

A.      Pursuant to the equipment lease agreements as amended and modified and together with the terms and conditions relating thereto, Xerox leased certain equipment to Debtor described on *Exhibit A* attached hereto and made a part hereof (the "*Leases*" and each individually, a "*Lease*").   The Leases and all service, maintenance and supply agreements relating to the equipment under the Leases and all other documents and instruments currently evidencing and securing the Leases are referred to collectively as the "*Current Contract Documents*." The Current Contract Documents, as modified by this Modification, are referred to as the "*Contract Documents*," and references in the Current Contract Documents and this Modification to the "*Contract Documents*," or any of them, shall be deemed to be a reference to such Contract Documents as modified by this Modification.   The Current Contract Documents associated with a particular Lease are referred to by reference to the number of the particular Lease or serial number of the related equipment as set forth on *Exhibit A*.

B.      Debtor has failed to make the payments required under the Current Contract Documents and has failed to pay the current past due invoices as required under the Current Contract Documents, and such failures have resulted in defaults under the Current Contract Documents (the "*Acknowledged Defaults*").   As a result of the Acknowledged Defaults, Xerox is entitled to declare that all indebtedness evidenced by the Current Contract Documents is immediately due and payable in full and upon such declaration Xerox will be entitled to exercise its remedies under the Current Contract Documents.

C.      Debtor has requested that Xerox modify the Current Contract Documents as provided in this Modification and the amendments referenced herein, forbear from exercising Xerox's rights and remedies under the Current Contract Documents, and Xerox is willing to so modify the Debt and the Current Contract Documents and forbear, subject to the terms and conditions set forth in this Modification.

D.      Capitalized terms used in this Modification and not otherwise defined in this Modification shall have the meanings given to those terms in the applicable Current Contract Documents.

### AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor and Xerox agree as follows:

1

1.     <u>Accuracy of Preliminary Statement; Effective Date</u>.  Debtor acknowledges the accuracy of the Preliminary Statement and the parties agree that the Preliminary Statement is a part of this Modification.  Debtor also acknowledges and agrees that:

(a)     <u>Information</u>.  The information set forth on ***<u>Exhibit A</u>*** is correct with respect to the referenced Contract Documents, including the past due invoices and amounts (collectively, the "***Debt***").  Such Debt is due and owing under the Contract Documents, without defense, offset or counterclaim.

(b)     <u>Acknowledged Defaults</u>.  The Acknowledged Defaults exist under the Current Contract Documents, the occurrence of which entitles Xerox to exercise all of the rights and remedies contained in the Current Contract Documents and applicable law.  Debtor has no defenses, counterclaims, or rights of setoff with respect to the Acknowledged Defaults.  The modifications of the Current Contract Documents and the forbearance set forth in this Modification and the obligations of Xerox pursuant to this Modification will be effective on the date that Xerox determines that the conditions precedent set forth in this Modification have been satisfied in full (such date, the "***Effective Date***").

(c)     As used in this Modification, "***Event of Default***" means any event or circumstance that is continuing and that, with the giving of notice, or the passage of time, or both, would constitute a default, breach or an event of default under any of the Contract Documents, including this Modification and the Note (as defined below), other than the Acknowledged Defaults.

2.     <u>Modification of Current Contract Documents</u>.  In addition to any and all other modifications made by this Modification, the Leases set forth on ***<u>Exhibit B</u>*** attached hereto and made a part hereof, are hereby amended to provide for the revised terms, payment periods and payment amounts described below and as shown on ***<u>Exhibit B</u>*** (the "***Payment Term Modifications***").

(a)     The term of the Lease relating to the iGen150C (Serial No. XRD004557) is hereby extended for a new term of 60 months commencing on August 1, 2016 and expiring July 31, 2021.  Commencing August 1, 2016, the new monthly base lease charge under the lease for the iGen150C (XRD004557) will be $6,875.17.

(b)     The term of the Lease relating to the iG150EF12 (Serial No. B3L698371) is hereby extended for a new term of 60 months commencing on August 1, 2016 and expiring July 31, 2021.  Commencing August 1, 2016, the new monthly base lease charge under the lease for the iG10EF12 (B3L698371) will be $1,669.26.

(c)     The term of the Lease relating to the iGen150C (Serial No. XRD004598) is hereby extended for a new term of 60 months commencing on August 1, 2016 and expiring July 31, 2021.  Commencing August 1, 2016, the new monthly base lease charge under the lease for the iGen150C (XRD004598) will be $9,103.63.

(d)     The term of the Lease relating to the iG150EF12 (Serial No. B2L698377) is hereby extended for a new term of 60 months commencing on August 1, 2016 and

2

expiring July 31, 2021.  Commencing August 1, 2016, the new monthly base lease charge under the lease for the iG150EF12 (B2L698377) will be $1,669.26.

The Payment Term Modifications set forth above and on *Exhibit B* hereto shall be effective as of August 1, 2016 notwithstanding the date of execution or Effective Date of this Modification.  Except as modified and amended by this Modification, the Leases and all other Contract Documents shall remain the same and in full force and effect.  Any other supply, maintenance or service agreements between Xerox or its affiliates and Debtor shall remain in full force and effect in accordance with their respective terms and the terms of this Modification shall not modify or amend any such supply, maintenance or service agreements except as expressly provided above.

3.     Forbearance.  Subject to the terms and conditions set forth in this Modification, Xerox shall forbear from exercising its rights and remedies under the Current Contract Documents until the occurrence of an Event of Default.  Notwithstanding any provision in the Current Contract Documents requiring written notice from Xerox prior to Xerox pursuing its rights or remedies under the Current Contract Documents or applicable law, upon the occurrence of an Event of Default, Xerox shall immediately be entitled to pursue its rights and remedies under any or all of the Contract Documents and applicable law without notice.

4.     Promissory Note.  Upon execution of this Modification, Debtor shall execute and deliver to Xerox a Promissory Note in the amount of **$249,032.12** in the form required by Xerox (the "*Note*").  The principal amount of the Note is comprised of a portion of the past due Debt amounts due under the Current Contract Documents and other supply and maintenance payments due shown on *Exhibit A* hereto as the Unpaid and Past Due Invoices.  The Note constitutes an agreement between Debtor and Xerox to establish the amounts and times of payments to be made by Debtor, on account of the said past due balances, to cure certain defaults under one or more of the Contract Documents.  The payment amounts set forth in the Note shall not be adjusted to reflect any prepayments.

5.     Financial Information.  On a quarterly and fiscal year-end basis beginning in September 2016 and continuing until payment in full of the Note and the Debt, Debtor shall deliver to Xerox a report consisting of a profit and loss statement, balance sheet with respect to the month preceding the month during which such financial information is to be provided.  In addition to the foregoing, Debtor shall provide to Xerox (a) on a quarterly and fiscal year-end basis beginning in September 2016, current schedules of Debtor's accounts receivable and accounts payable; (b) from time to time, such further reports and information as Xerox may request; (c) audited annual financial statements of Debtor as and when produced, if produced; and (d) annual federal tax returns.  Each annual financial statement and annual federal tax return shall be provided to Xerox within 120 days following the end of the period to which such statement or return pertains.

6.     Debtor Representations, Warranties and Covenants.  As additional consideration to and inducement for Xerox to enter into this Modification, Debtor represents and warrants to and covenants with Xerox as follows:

3

(a)      Representations and Warranties.    Each and all representations and warranties of Debtor in the Current Contract Documents are and will continue to be accurate, complete and correct.  The representations and warranties in this Modification are true, complete and correct as of the date set forth above, will continue to be true, complete and correct as of the consummation of the modifications contemplated by this Modification, and will survive such consummation.

(b)      No Defaults.   Except for the Acknowledged Defaults, Debtor is not in default under any of the Contract Documents, nor has any event or circumstance occurred that is continuing that, with the giving of notice or the passage of time, or both, would be a default or an event of default by Debtor under any of the Contract Documents.

(c)      No Material Changes.   There has been no material adverse change in the financial condition of Debtor or any other person whose financial statement has been delivered to Xerox in connection with the Debt from the most recent financial statement received by Xerox from Debtor or such other persons.

(d)      No Conflicts; No Consents Required.   Neither execution nor delivery of this Modification nor fulfillment of or compliance with the terms and provisions hereof will conflict with, or result in a breach of the terms or conditions of, or constitute a default under, any agreement or instrument to which Debtor is a party or by which Debtor may be bound.  No consents, approvals or authorizations are required for the execution and delivery of this Modification by Debtor or for Debtor's compliance with its terms and provisions.

(e)      Claims and Defenses.   Debtor has no claims, counterclaims, defenses, or set-offs with respect to the Debt or the Contract Documents.  Xerox and its predecessors in interest have performed all of their obligations under the Contract Documents, and Debtor has no defenses, offsets, counterclaims, claims or demands of any nature which can be asserted against Xerox or its predecessors in interest for damages or to reduce or eliminate all or any part of the obligations of Debtor under the Contract Documents.

(f)      Validity.   This Modification and the other Contract Documents are and will continue to be the legal, valid and binding obligations of Debtor, enforceable against Debtor in accordance with their terms.

(g)      Valid Existence, Execution and Delivery, and Due Authorization.   Debtor validly exists under the laws of the State of its formation or organization and has the requisite power and authority to execute and deliver this Modification and to perform the Contract Documents.   The execution and delivery of this Modification and the performance of the Contract Documents have been duly authorized by all requisite action by or on behalf of Debtor.  This Modification has been duly executed and delivered on behalf of Debtor.

(h)      Ratification of Current Contract Documents and Collateral.   The Current Contract Documents, as modified by this Modification and the amendments described in Section 2 above, are hereby ratified and affirmed by Debtor and shall remain in full force

4

and effect. Except to the extent, if any, specifically provided for in this Modification: (i) any liens of Xerox on and security interests in any and all real or personal property (tangible or intangible) granted as security for any of the Debt shall continue in full force and effect and none of such property is or shall be released from such liens and security interests; and (ii) this Modification shall not constitute a waiver of any rights or remedies of Xerox in respect of the Contract Documents.

(i)     No Duress. Debtor has executed this Modification and all other documents in connection herewith as a free and voluntary act, without any duress, coercion or undue influence exerted by or on behalf of Xerox or any other party.

(j)     Subordination. All indebtedness and other obligations of Debtor now or hereafter owing to any shareholders, officers, members or managers of Debtor and any Affiliates of Debtor shall be subordinated in right of repayment to all indebtedness and other obligations of Debtor to Xerox. Debtor shall, upon request by Xerox, enter into subordination agreements as may be required by Xerox from time to time in form and substance satisfactory to Xerox in its sole discretion.

7.     Release. Debtor fully, finally and forever releases and discharges Xerox and Xerox Capital Services, LLC and their respective Affiliates, shareholders, directors, employees and agents (collectively, the *"Lender Parties"* and each a *"Lender Party"*) from any and all actions, causes of action, claims, debts, demands, liabilities, obligations and suits, of whatever kind or nature, in law or equity, that Debtor has or in the future may have, whether known or unknown (i) in respect of the Debt, this Modification, the Note, the other Contract Documents or the actions or omissions of Xerox in respect of the Debt, the Note or the Contract Documents and (ii) arising from events occurring prior to the date of this Modification.

8.     Fees and Costs. Contemporaneously with the execution and delivery of this Modification, Debtor will pay the following amounts to Xerox, in addition to any other amounts required to be paid to Xerox pursuant to this Modification: (a) the closing payment schedule attached hereto as *Exhibit C* and made a part hereof (the *"Closing Schedule"*))

9.     Conditions Precedent. The obligations of Xerox to consummate the transactions contemplated by this Modification are subject to satisfaction of the following conditions precedent, each in the sole and absolute discretion of Xerox:

(a)     Debtor Performance. Debtor has duly executed and delivered this Modification and paid all fees and other amounts and performed all obligations required under this Modification to be paid and performed contemporaneously with the execution and delivery of this Modification.

(b)     Representations and Warranties. The representations and warranties of Debtor contained in this Modification and any other document or instrument expressly contemplated by this Modification shall be true and correct in all material respects.

(c)     Existence and Authority. If requested by Xerox, Debtor shall have provided Xerox with evidence that Debtor is in good standing under the laws of its state of formation and in each state in which any collateral for the Debt is located and that the

5

person or persons executing this Modification on behalf of Debtor is duly authorized to do so.

      (d)   <u>No Default</u>.  No event or circumstance shall have occurred that is continuing, that, with the giving of notice or the passage of time, or both, would be a default or an event of default under any of the Contract Documents.

      (e)   <u>Lien Priority</u>.  Xerox shall have received such UCC search results, title reports and title insurance endorsements as Xerox shall reasonably require evidencing the ownership of the equipment under the Contract Documents or the continuing first and prior lien of all of Xerox's liens and security interests in the collateral described in any of the Contract Documents, as applicable.

      (f)   <u>Insurance</u>.  Debtor shall have provided Xerox with evidence satisfactory to Xerox that all insurance required by the Contract Documents is in full force and effect.

      (g)   <u>Promissory Note</u>.  Debtor shall have executed and delivered the original Promissory Note as described in Section 4 above.

      (h)   <u>Closing Schedule</u>.  Debtor shall have paid all amounts due under the Closing Schedule.

10.   <u>Section Intentionally Omitted.</u>

   11.   <u>Inspections</u>.  Debtor shall permit representatives of Xerox to visit and inspect any of the equipment relating to the Contract Documents and the business offices of Debtor, to examine and make copies or extracts from the books and records of Debtor, and to discuss the affairs, finances and accounts thereof with, and to be advised as to the same by, its principal officers and the accountants of Debtor, all at such reasonable times during business hours and at such intervals as Xerox may desire. Debtor releases Xerox and its officers, directors, employees and agents from any and all claims arising from Xerox's visitations, inspections and consultations conducted under this Section.

   12.   <u>Cross Default and Cross Collateral</u>.  Without limiting the extent to which such matters are already granted and agreed to in the Current Contract Documents, Debtor hereby agrees, confirms, and acknowledges that a default under any Current Contract Documents will be a default under any other Current Contract Documents, this Modification and the Note. Without limiting the extent to which such matters are already granted and agreed to in the Current Contract Documents, Xerox and Debtor hereby agree, confirm, and acknowledge that:  (a) any collateral now or hereafter securing the Debt or any portion thereof shall secure the payment and performance by Debtor of all Debt obligations and obligations under the Current Contract Documents; and (b) except as otherwise expressly provided in the Current Contract Documents, the Security Agreement and this Modification, Xerox's liens and security interests in any collateral now or hereafter securing the Debt or any portion thereof shall secure all Debtor's obligations under the Contract Documents and shall not be terminated or released in whole or in part unless and until all of the Debts are fully paid and satisfied, notwithstanding the fact that one or more of the obligations under a Contract Document may become fully paid.

4835-6778-9875.1

13.     **CONFIDENTIALITY.   DEBTOR SHALL NOT DISCLOSE ANY PROVISION OR CONTENT OF THIS MODIFICATION, ANY OF THE CONTRACT DOCUMENTS, OR ANY TERM SHEET OR OTHER COMMUNICATION PERTAINING TO ANY OF THE FOREGOING, TO ANY PERSON EXCEPT PERSONS WHO ARE OFFICERS, DIRECTORS, EMPLOYEES, ATTORNEYS, ACCOUNTANTS AND CONSULTANTS OF OR FOR DEBTOR AND WHO HAVE A NEED TO KNOW INFORMATION REGARDING SUCH PROVISION OR CONTENT FOR PURPOSES OF THE CONDUCT OF DEBTOR'S BUSINESS. DEBTOR ACKNOWLEDGES THAT A VIOLATION OF THE FOREGOING SENTENCE WILL CAUSE IRREPARABLE LOSS AND HARM TO XEROX WHICH CANNOT BE REASONABLY OR ADEQUATELY COMPENSATED BY DAMAGES IN AN ACTION AT LAW AND, ACCORDINGLY, THAT XEROX WILL BE ENTITLED, WITHOUT POSTING BOND OR OTHER SECURITY, TO INJUNCTIVE AND OTHER EQUITABLE RELIEF TO ENFORCE THE FOREGOING SENTENCE AND TO PREVENT THE CONTACTS AND BREACHES OR CURE ANY BREACH OR THREATENED BREACH OF THE FOREGOING SENTENCE OF THIS MODIFICATION**

14.     Entire Agreement; Change; Discharge; Termination or Waiver. The Current Contract Documents, as modified by this Modification and the amendments described in Section 2 above, contain the entire understanding and agreement of Debtor and Xerox in respect of the Debt and supersede all prior representations, warranties, agreements and understandings. No provision of the Contract Documents may be changed, discharged, supplemented, terminated or waived except in a writing signed by Xerox and Debtor.

15.     No Limitations. The description of the Contract Documents contained in this Modification is for informational and convenience purposes only and shall not be deemed to limit, imply or modify the terms or otherwise affect the Contract Documents. The description in this Modification of the Acknowledged Defaults under the Current Contract Documents shall not be to the exclusion of any other defaults now existing or hereafter occurring under the Contract Documents. The description in this Modification of the specific rights of Xerox shall not be deemed to limit or exclude any other rights to which Xerox may now be or may hereafter become entitled to under the Contract Documents at law, in equity or otherwise.

16.     Time of the Essence. Time is of the essence in this Modification.

17.     Binding Effect. The Contract Documents, as modified by this Modification, shall be binding upon, and inure to the benefit of, Debtor and Xerox and their respective successors and assigns.

18.     Further Assurances. Debtor shall execute, acknowledge (as appropriate) and deliver to Xerox such additional agreements, documents and instruments as reasonably required by Xerox to carry out the intent of this Modification.

19.     Counterpart Execution. This Modification may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document. Signature pages may be detached from the counterparts and attached to a single copy of this Modification to physically form one document. Delivery of an

7

executed signature page of this Modification by facsimile or e-copy transmission shall be as effective as delivery of a manually executed counterpart thereof.

20.    Limitation of Liability for Certain Damages.  In no event shall any Lender Party be liable to Debtor or any of its affiliates (collectively the "*Credit Parties*" and individually a "*Credit Party*") on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).  **DEBTOR AND EACH OTHER CREDIT PARTY HEREBY WAIVE, RELEASE AND AGREE NOT TO SUE UPON (AND DEBTOR SHALL CAUSE EACH OF THE OTHER CREDIT PARTIES TO SO WAIVE, RELEASE, AND AGREE NOT TO SUE UPON) ANY SUCH CLAIM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.**

21.    Jurisdiction and Service of Process.

(a)    Submission to Jurisdiction.  Any legal action or proceeding with respect to any Contract Document shall be brought exclusively in the courts of the State of New York located in Monroe County or of the United States for the District of New York, and Debtor and each other Credit Party accept for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts; *provided, however,* that nothing in this Modification shall limit or restrict the right of Xerox to commence any proceeding in the federal or state courts located in the state in which property securing the Debt is located to the extent Xerox deems such proceeding necessary or advisable to exercise remedies available under any Contract Document.  Xerox, Debtor and each other Credit Party hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(b)    Service of Process.  Debtor and each other Credit Party hereby irrevocably waive personal service of any and all legal process, summons, notices and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding brought in the United States of America with respect to or otherwise arising out of or in connection with any Contract Document by any means permitted by applicable law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of Debtor specified on the first page hereof (and shall be effective when such mailing shall be effective, as provided therein).  Debtor and each other Credit Party agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing contained in this subsection shall affect the right of Xerox to serve process in any other manner permitted by applicable law.

(c)    Non-Exclusive Jurisdiction.  Nothing contained in this Section shall affect the right of Xerox to serve process in any other manner permitted by applicable law or commence legal proceedings or otherwise proceed against any Debtor Party in any other jurisdiction.

22.  <u>Disclosure Authorization.</u>  Debtor authorizes its banks, creditors (including trade creditors), vendors, suppliers, customers, and each franchisor to disclose and release to Xerox any and all information any of them may request from time to time regarding (a) any depository, loan or other credit account of Debtor; (b) the status of any loan or loan agreement relating to Debtor or its affiliates; (c) the affairs and financial condition of Debtor; and (d) Debtor's business operations.    Debtor expressly authorizes Xerox to perform background, credit, judgment, lien and other checks, searches, inspections and investigations and to obtain personal and business credit reports and asset reports with respect to Debtor and to answer questions about their respective credit experience with Debtor.  The information obtained by the Xerox pursuant to this paragraph, together with all other information which any of the Lender Parties now possess, or in the future may acquire, with respect to Debtor, the Collateral, or the business operations of Debtor, is referred to as the "***Debtor Information***."

23.  <u>Permitted Disclosures.</u>  Debtor authorizes each Lender Party to disclose Debtor Information as follows:  (a) to any proposed transferee, purchaser, assignee, servicer, participant, lender, investor, ratings agency, or other Person with respect to any proposed sale, assignment, or other transfer by Xerox of any of its rights in the Contract Documents, including servicing rights, or sale or other disposition of any of the Collateral; (b) to any of the other Lender Parties or any insurance or title company in connection with the transactions contemplated by the Contract Documents, including any action, suit, or proceeding arising out of, in connection with, or relating to, this Modification and the other Contract Documents, the Debt, or any other transaction contemplated hereby, including in connection with the exercise of Xerox's rights and remedies; (c) to the extent such information is or becomes available to a Lender Party from sources not known by such Lender Party to be subject to disclosure restrictions; (d) to the extent disclosure is required by applicable law or other legal process or is requested or demanded by any governmental authority; and (e) as may otherwise be authorized in writing by Debtor. Debtor agrees that the disclosures permitted by this Section and any other disclosures of Debtor Information authorized pursuant to any of the Contract Documents may be made even though any such disclosure may involve the transmission or other communication of Debtor Information from the nation of residence or domicile of such Debtor or a Lender Party to another country or jurisdiction, and  Debtor waives the provisions of any data privacy law, rule, or regulation of any applicable governmental authority that would otherwise apply to the disclosures authorized in this Section.

24.  <u>Post-Default Waiver of Collateral Disposition Rights</u>.  A default and an event of default have occurred under the Contract Documents and notwithstanding any forbearance or other provision set forth herein, such default and event of default remain as pre-existing events. Debtor hereby waives (i) any and all rights that it may have to notification of disposition of collateral under Section 9-611 of the Uniform Commercial Code; (ii) any and all rights that it may have to require disposition of collateral under Section 9-620(e) of the Uniform Commercial Code; and (iii) any and all rights that it may have to the right to redeem the Collateral under Section 9-623 of the Uniform Commercial Code.

25.  <u>WAIVER OF JURY TRIAL</u>.  XEROX, DEBTOR AND EACH OTHER CREDIT PARTY, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS MODIFICATION, THE OTHER CONTACT DOCUMENTS

9

AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY.  THIS
WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING
IN TORT, CONTRACT OR OTHERWISE.

26.    Governing Law.  The laws of the State of New York (without giving effect to its
conflicts of laws principles) shall govern all matters arising out of, in connection with or relating
to this Modification and the other Contract Documents, including its validity, interpretation,
construction, performance and enforcement; *provided, however,* that with respect to any married
individual signing this Modification who is not a resident of the State of New York, this Section
shall not be a contractual choice of the community property laws of the State of New York.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
EXECUTION PAGE FOLLOWS.]

10

Executed and effective as of the date first set forth above.

XEROX:

XEROX CORPORATION

By: _____

Name: _____ MARK LACOURSE _____

Its Authorized Signatory



DEBTOR:

UNIVERSAL WILDE, INC., a Massachusetts corporation

By: _____

Name: _____ William L. Gentes _____

C FO

7/26/16

14

## EXHIBIT A

## THE CONTRACTS AND LEASES

| Equipment | Serial Number | Unpaid and Past Due Invoices | Proposed Disposition of Unpaid and Past Due Invoices | | |
|---|---|---|---|---|---|
| | | | Promissory Note | July Cure Payment | August Cure Payment |
| iGen150C | XRD004557 | $203,810.63 | $13,810.63 | $125,000.00 | $65,000.00 |
| iG150EF12 | B3L698371 | $4,747.28 | $4,747.28 | — | — |
| iGen150C | XRD004598 | $140,534.11 | $140,534.11 | — | — |
| iG150EF12 | B2L698377 | $7,120.92 | $7,120.92 | — | — |
| iGen4P | PWB005200 | $78,582.90 | $78,582.90 | — | — |
| iG4EF13 | X29313163 | $0.00 | $0.00 | — | — |
| Watkiss Powersquair | B0T308525 | $1,306.00 | $1,306.00 | — | — |
| Other | B6U308816 | $576.00 | $576.00 | — | — |
| Software | KMB001322 | $357.00 | $357.00 | — | — |
| Software | KMB003921 | $244.86 | $244.86 | — | — |
| License Kit | VCT000602 | $340.00 | $340.00 | — | — |
| WC7345PF | FKA467039 | $1,170.38 | $1,170.38 | — | — |
| WC7345PF | FKA466701 | $117.04 | $117.04 | — | — |
| Late Fee | N/A | $125.00 | $125.00 | — | — |
| TOTAL | | $439,032.12 | $249,032.12 | $125,000.00 | $65,000.00 |

4835-6778-9875.1

## EXHIBIT B

## PAYMENT TERM MODIFICATIONS

| Equipment Description | Serial Number | New Term (Months) | Monthly Lease Equipment Payment |
|---|---|---|---|
| iGen150C | XRD004557 | 60 | $6,875.17 |
| iG150EF12 | B3L698371 | 60 | $1,669.26 |
| iGen150C | XRD004598 | 60 | $9,103.63 |
| iG150EF12 | B2L698377 | 60 | $1,669.26 |

4835-6778-9875.1

## EXHIBIT C

## CLOSING SCHEDULE

| Payment Description | Payment Amount |
|---|---|
| July Cure Payment in verifiable funds no later than July 31, 2016 | $125,000.00 |
| August Cure Payment in verifiable funds no later than August 22, 2016 | $ 65,000.00 |

4835-6778-9875.1